William R. FRY, Anthony J. Marra, Sidney Mishkin, Thomas J. Dwyer, Kathleen B. Dwyer, Progressive Corporation, and Meridian Strategic Investments, L.P., Plaintiffs,

v.

UAL CORPORATION, a Delaware Corporation, Defendant.

No. 90 C 0999.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 11, 1995.

---

Charles J. Barnhill, Davies, Barnhill & Galland, P.C., Madison, WI, David Barry Kahn, Mark E. King, David B. Kahn & Associates, Ltd., Northfield, IL, for plaintiffs.

Susan Getzendanner, Donna L. McDevitt, Charles F. Smith, Jr., John Kevin Lyons, Addison D. Braendel, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This is a class action securities fraud suit brought by the plaintiffs on behalf of all persons who sold Allegis[1] common stock or puts in Allegis common stock between October 29, 1987 and December 8, 1987.[2] The suit arises out of defendant UAL Corporation's ("UAL") public announcement on October 29, 1987, that it would distribute the proceeds of the divestiture of certain of its non-core businesses[3] as a special dividend. No such dividend was declared. Instead, defendant's Board subsequently announced that it would repurchase outstanding shares of its stock with the proceeds. The essence of plaintiffs' complaint is that UAL committed fraud when it made its dividend announcement by failing to disclose (i) that its largest shareholder had demanded that the divestiture proceeds be distributed in the form of a stock repurchase (also referred to herein as a "self-tender" or "buy back") and that it was engaged in negotiations with that shareholder relating to the stock repurchase, and (ii) that it had not yet completed its analysis of the preferred method of distributing the proceeds (particularly, through a special dividend or a stock repurchase). Counts I and II of plaintiffs' first amended complaint each assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder ("Rule 10b–5"), 17 C.F.R. §. 240.10b–5. Counts III–VI invoke the Court's supplemental jurisdiction and assert state-law claims of common law fraud (counts III and IV) and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., (counts V and VI) based on the same underlying conduct. Defendant's motion for summary judgment is presently before the Court. For the following reasons, the motion is granted.

## FACTUAL HISTORY

Our recitation of the facts begins with a discussion of the (relatively) undisputed facts that provide an overview of the dispute; then, we turn to a consideration of the evidence surrounding the more hotly disputed

---

1. Defendant UAL Corporation, the parent corporation of United Air Lines, was known as Allegis Corporation during the class period; therefore, the securities at issue will be referred to as Allegis common stock or puts in Allegis common stock. See Def.'s Facts ¶ 4. This opinion shall refer to UAL and Allegis interchangeably.

2. This case was originally assigned to Judge Nordberg's calendar. It was reassigned to this Court's calendar by Order of the Executive Committee effective May 25, 1994. For Judge Nordberg's opinion certifying the class, see Fry v. UAL Corp., 136 F.R.D. 626 (N.D.Ill.1991).

3. In addition to owning United Airlines, Allegis owned a number of travel related businesses, including Hilton hotels, Westin hotels, and the Hertz car rental business. Def.'s Facts ¶ 4.

facts.[4] The plaintiffs in this class action consist of persons selling Allegis common stock and or put options[5] on Allegis common stock between October 29 and December 8, 1987.

In May of 1987, Coniston Partners ("Coniston") acquired a substantial interest in Allegis. Specifically, Coniston purchased approximately 7.7 million shares (over 13%) of Allegis common stock, making Coniston Allegis' largest shareholder. Def.'s Facts ¶ 16. Coniston announced that it would solicit shareholder consents in order to obtain majority representation on Allegis' board with an eye toward divesting Allegis of, among other things, its non-core businesses. *Id.* ¶¶ 18–21. Defendant hired the First Boston Corporation to advise the Board of Directors on issues raised by Coniston's consent solicitation, and, later, to carry out the divestiture program; the law firm of Davis, Polk & Wardwell ("Davis Polk") was retained to serve as principal legal advisor. *Id.* ¶¶ 11, 12.

At a special meeting of the Allegis Board on June 9, 1987, Allegis' Board requested and accepted the resignation of its Chairman and CEO, Richard Ferris, and elected Frank Olson to replace Ferris. *Id.* ¶¶ 7, 20. At that same meeting, Olson suggested that the company's financial advisors, First Boston and Morgan Stanley, reconsider proposals to restructure the company, presuming that such a plan would include the sale of Hertz, Westin, and Hilton. *Id.* ¶ 21; Def.'s Facts, Special Meeting Minutes at 12. UAL intimates that this action was not forced by Coniston's hand but instead merely reflected a sound business decision of the Board. This position is belied by the record. Allegis' General Counsel Ed Hoenicke testified that in deciding not to move forward with a debt capitalization plan that was under consideration but instead to sell off the non-airline assets,

> [t]he board decided that they would essentially accede to the demands of the Coniston partners and the shareholders because they had been advised that an informal poll of the shareholders indicated that there was no way that United or Allegis would win any consent vote and, therefore, they accepted the inevitable and were very reluctantly willing to sell off the non-airline

---

**4.** Our discussion of the facts is derived from the parties' Local General Rule 12 statements of material facts, and accompanying exhibits. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." UAL's statement shall be cited herein as "Def.'s Facts ¶ __." Similarly, Local Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Plaintiffs' response shall be cited as "Pls.' Facts ¶ __." Local Rule 12(N)(3)(b) authorizes the nonmoving party to submit a statement of "additional facts that require the denial of summary judgment." Pursuant to Local Rule 12(M), the moving party may then submit a response to the nonmoving party's additional facts. Plaintiffs' statement of additional facts shall be cited as "Pls.' Add'l Facts ¶ __" and UAL's response shall be cited as "Def.'s Reply Add'l Facts ¶ __." All properly supported material facts set forth in either party's statement (i.e., Def.'s Facts or Pls.' Add'l Facts) are deemed admitted unless properly controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th

Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

**5.** A put is a security which gives its owner the right to sell a fixed number of shares of a specified common stock at a given price at any time on or before the expiration date. Holders pay an option premium to obtain these option contracts. Exchange-listed option contracts are sold on secondary markets. The Option Clearing Corporation, a private company, stands as an intermediary between option buyers and sellers. *See* Staff of the SEC, 96th Cong., 1st Sess., Report of the Special Study of the Options Market 76 (House Comm. on Interstate and Foreign Commerce Print 1979) (hereinafter "Special Study Report"); The Options Clearing Corp., Characteristics and Risks of Standardized Options 4–8; *see also generally* Henry F. Johnson, *Is It Better to Go Naked On The Street? A Primer on the Options Market,* 55 Notre Dame L.Rev. 7, 7–8, 11 (1979) (hereinafter "Options Primer").

assets with the purpose of retaining as strong an airline company as possible.

Hoenicke Dep. at 30. In elaborating on the Board's reluctance to sell off some of Allegis' non-airline assets, Hoenicke observed,

> this board had previously approved the diversification plan, the purchase of Hertz, and the purchase of Hilton International. They were very enamored of the hotel business having been associated with Westin for a long period of time. Some of the directors were the chief executives of these subsidiaries, so that selling them off was like cutting off ... their right arms.

*Id.* at 30–31. In a related vein, plaintiffs also note that Allegis had just closed on its purchase of the Hilton subsidiary less than three months before its announcement that it would sell Hilton. *See* Pls.' Facts ¶ 22.

In view of what Coniston perceived to be Allegis' commitment to this restructuring program, Coniston, in turn, announced that it would terminate its planned solicitation of consents for replacement of the existing Allegis Board. Def.'s Facts ¶ 23. Defendants seize on the use of the word "terminate" in Coniston's announcement to suggest that thereafter the specter of a Coniston proxy solicitation was absent. Plaintiffs contend that the threat of a solicitation was always present and available in the event that Coniston did not get its way.

Robert Calhoun and Harry Pinson were the First Boston team members with principal responsibility for devising a plan for the divestiture and distribution of Allegis' non-airline assets and discussing related issues with the Allegis Board. Pinson Dep. at 16, 19. At an Allegis Board meeting on June 25, 1987, Calhoun presented a plan to sell Hertz, Westin, and Hilton and distribute the proceeds to shareholders. In its presentation, First Boston referred to the potential distributions as "dividends" and did not refer to any other possible distribution method. *Id.* ¶ 24. Following the June 25, 1987 Board meeting, Olson distributed a letter to Allegis' shareholders announcing that Allegis would sell its non-airline businesses and distribute the proceeds to shareholders. *Id.* ¶ 26. Olson's letter states, in pertinent part: "We have determined to proceed immediately with the sale of all of our non-airline businesses—Hertz, Westin and Hilton International—and to distribute the net proceeds from those sales to stockholders." Def.'s Facts, Ex. 13. Allegis subsequently entered into agreements for the sale of its non-airline businesses. The sales closed between October 1987 and January 1988. *Id.* ¶ 27.

On October 19, 1987, the stock market dropped almost 500 points, the greatest daily drop since the Great Depression. *Id.* 40. The price of Allegis common stock dropped from $93.875 to $66 per share. *Id.* In response, the Allegis Executive Committee met twice and the Allegis Board met once during the period from October 20 through October 29, 1987, to discuss, among other things, the impact of the crash, the decline in Allegis stock prices, and the status of the sales of Allegis' non-airline businesses. *Id.* ¶ 41. On October 20, 1987, the Executive Committee authorized a stock repurchase plan to stabilize the market for Allegis shares and take advantage of the low price at which Allegis stock was then trading. Def.'s Facts ¶ 42.

The Board's Executive Committee met on October 28, 1987. The minutes of that meeting state, in pertinent part:

> Messrs. Pinson and Calhoun outlined First Boston's recommendations and timetable on the distribution to shareholders of net proceeds from the sale of the Corporation's non-airline assets. After discussion, the Executive Committee recommended that the Board of Directors make an announcement of the Board's intention to declare a dividend of the net proceeds of the sale of Hilton International in several weeks, and to declare dividends of the net proceeds of the sales of Hertz and Westin as these sales close.

Def.'s Facts, Ex. 2, Oct. 28, 1987 Exec.Comm.Minutes at 4. The minutes of the full Board meeting on October 29, 1987 reflect that Chairman Olson reported on the Executive Committee meeting, including the discussion of the "special dividend distribution to shareholders." *Id.,* Ex. 4, Oct. 29 Board Minutes at 3. The minutes further state:

At the invitation of the Chairman, Messrs. Pinson and Calhoun of The First Boston Corporation reviewed the possibility of a special dividend distribution or distributions to shareholders resulting from the sales of Hilton International, Hertz and Westin.... After discussion, the Board of Directors unanimously approved the issuance of a press release by the Corporation concerning the Board's intention to distribute to stockholders the net proceeds of the sales of the Corporation's subsidiaries.

*Id.* at 5. Following the October 29, 1987 Board meeting, the Board released the following public announcement:

The Board of Directors of Allegis Corporation today reaffirmed the previously announced plan to distribute to shareholders the net proceeds from the sales primarily of its non-airline assets.... The Board of Allegis elected to declare distributions after the closing of each transaction and after completion of necessary refinancing arrangements. The first dividend declaration is expected in early December. Subsequent declarations will follow....

*Id.* ¶ 46.

At a meeting on December 7, 1987, the Executive Committee reviewed and approved a recommendation made by First Boston that the Board consider a tender offer as an alternative to the dividend distribution. *Id.* ¶ 56. First Boston's Robert Calhoun reviewed with the Executive Committee two basic advantages of a tender offer over a dividend: (1) a tender offer would have less adverse tax consequences to most stockholders because their gain would be capital gain, rather than ordinary income, and the gain would be partially offset by their basis in the stock; and (2) a tender offer would result in less pressure on the value of Allegis stock, because a dividend declaration would likely result in much tax selling of the stock and could force the price of the stock down. *See* Def.'s Facts, Ex. 6, Exec.Comm.Minutes at 2.

On December 9, 1987, the Board formally considered the self-tender alternative. *Id.* ¶ 57. Following its meeting of December 9, 1987, the Board issued a press release announcing that:

as a result of recent changes in stock market conditions and in consultation with its financial advisor, The First Boston Corporation, it is considering a tender offer for a substantial number of shares as an alternative to the previously announced intention to declare a dividend ... [with] a final decision ... expected to be made in January.

*Id.* ¶ 58. Following the Board's announcement on October 29, and prior to the December 9 announcement, plaintiffs sold shares of Allegis common stock and/or put options on Allegis common stock.

At a meeting on January 28, 1988, the Allegis Board rejected the dividend option and authorized a self-tender offer for 35.5 million shares. On February 17, 1988, Allegis filed, and formally issued, an offer to purchase the shares at $80 per share. *Id.* ¶ 59.

The foregoing is generally not materially disputed by the parties. What is disputed—sharply—is the extent, if any, to which Coniston "demanded," prior to October 29, 1987, that Allegis distribute the divestiture proceeds in a form other than a dividend and whether Coniston was engaged in negotiations with Allegis over such a demand on that date—when the Allegis Board announced that it would distribute the proceeds in the form of a special dividend. Plaintiffs contend that Coniston had made such a demand and that Allegis and Coniston were negotiating this demand; UAL contests both that such a demand was made and that any negotiations were ongoing. The parties also dispute whether any analysis of distribution methods by Allegis was ongoing as of October 29, 1987. Plaintiffs contend that such analysis was ongoing. UAL denies this, maintaining that by September 1987, it had concluded that nondividend distribution methods were not viable. UAL further contends that this issue was not reconsidered until after the stock market crash. We now consider the evidence relied upon by the parties in support of their respective positions.

As an initial matter, UAL disputes plaintiffs' contention that Coniston demanded a self-tender offer prior to the October 29, 1987 divestiture announcement. At most, UAL contends, Coniston expressed a preference

for, or suggested, a self-tender offer as a means of distributing the divestiture proceeds; however, such a preference or suggestion did not rise to the level of a demand and UAL was not negotiating with Coniston over this suggestion at the time of the October 29, 1987 announcement. UAL offers the following evidence.

First, during his deposition, one of Coniston's principals, Augustus (Gus) Oliver, questioned the proposition that Coniston "suggested" a nondividend type of distribution:

Q. Sometime in 1987 Coniston suggested a nondividend transaction; is that right?

A. I am not sure I would use the word "suggest." A capital gains type of transaction was certainly discussed.

Oliver Dep. at 50. Also, when asked directly whether Coniston had requested that Allegis utilize a self-tender prior to the crash, Oliver responded that he could not recall "any specific discussions about this issue prior to some time after the crash." *Id.* at 40. In a related vein, discussing Coniston's preference for a self-tender prior to the October 19, 1987 stock market crash, Oliver stated:

[M]y recollection is that until the crash, the form of the distribution, while of some interest to us, was not really a critical question, and that there was some discussion of that question prior to that time, but that it wasn't until some time after the crash that the issue became significantly more important to us.

*Id.* at 38; *see also id.* at 42 (Oliver's testimony that prior to the crash, the form of the distribution "really wasn't that big an issue for us"); *id.* at 52 (Oliver's testimony that prior to the crash, "the issue of being forced to sell in the market [to avoid the tax consequences of a dividend and achieve capital gains treatment], if it arose at all, was not a very consequential issue" and if the issue was considered "we didn't consider it to be a matter of great consequence"). Similarly, Keith Gollust, another Coniston principal, testified that during June, July and August

Coniston was "relatively indifferent between a cash tender offer or a dividend." Gollust Dep. at 116. Elaborating on this point, Gollust noted that after Allegis announced that it would sell off the non-airline assets and distribute the proceeds to shareholders, the stock responded very favorably and Coniston had a big gain in position, therefore:

[I]f the company chose to pay a dividend, we could have easily sold our stock in the market. I mean ... in light of the fact that this plan was underway, the stock was way up, there was huge trade in volume in the stock, it would have been very simple for us to sell our stock in the market and take a capital gain. Conversely, if they made a cash tender offer, we could either sell our stock in the market or participate in the cash tender offer. In either event, the tax treatment would have been the same.

Gollust Dep. at 117; *see also* Oliver Dep. at 56, 58–59 (testifying that the resulting taxable income for Coniston would have been the same for either type of distribution). Later in his deposition, Gollust reiterated this view but noted that the crash altered things:

although [capital gains treatment] was an issue which had relevance to us before the crash, before the crash, we felt that while it was always the case that we preferred a share repurchase program, we had the flexibility of selling our stock in the open market in the event the company declared a dividend. After the crash, the circumstances differed. So we had a strong preference for a share repurchase program after the crash.

Gollust Dep. at 182.

Also, it is undisputed that the Allegis Board met four times between June 25 and October 29, 1987, and that none of the minutes of any of those meetings even mentions a distribution method other than dividends. Def.'s Facts ¶ 45.[6] And, every Board member who was asked denied having any recollection that Allegis' advisors (the law firm of

6. Although plaintiffs concede that there is no such mention of alternative distribution forms in the minutes, they contend that the minutes are "inherently incomplete" and "not generally a reliable guide to what was said at board meetings. They have also been shaped by defendant, First Boston and Davis Polk with an eye toward this and other litigation." Pls.' Facts ¶ 45B.

Davis Polk and the First Boston investment firm) ever mentioned Coniston's proposal or preference for capital gains treatment on or before October 29, 1987. *See* Olson Dep. at 49, 63, 67, 76, 89, 91, 141 (testifying that from "early on" the Board was advised that the distribution would be in the form of a dividend and that it was not until December 1987 that a tender-offer alternative was raised to the Board); DeWindt Dep. at 57–58 (testifying that, with respect to any time in 1987, he had no recollection that Coniston had raised a question as to how the divestiture proceeds would be distributed and that, to his knowledge, as of August 19, 1987, Allegis was not considering any distribution method other than a dividend); McGillicuddy Dep. at 45–46 (testifying that to the best of his recollection the Allegis Board was not informed that Coniston had raised a question, in August of 1987, as to the form of the divestiture distribution); O'Connor Dep. at 66–67, 70–71 (testifying that with respect to the period between June and October 1987, he had no recollection of First Boston informing the Board as to the pros and cons of various distribution methods nor did the Board review any studies or recommendations regarding distribution methods; also testifying that he had no recollection of the Board ever being advised, in or about August 1987, that Coniston had taken a position of preferring capital gains treatment, or receiving the divestiture proceeds by means other than a dividend); Armstrong Dep. at 45–46 (not recalling any discussion in July and August or late summer and fall about the form of the distribution; not recalling seeing any documents from Allegis' advisors discussing the manner of distribution).

In a related vein, Allegis' General Counsel Hoenicke testified that he did not think he ever discussed the "issue of a dividend versus a tender offer or ordinary income versus capital gains income" with any member of the Board prior to December of 1987. Hoenicke Dep. at 131–32. And, First Boston's Harry Pinson testified that prior to October 1987, he never discussed the different tax consequences of a self-tender versus a dividend with the Board because First Boston had "thought that in general, the tax consequences would be either the same for broad classes of shareholders or ... they could employ trading strategies to get the tax consequences that they wanted." Pinson Dep. at 98. Robert Calhoun, also of First Boston, similarly testified:

> Prior to October 19th, which is the date of the stock market crash, I don't believe there was any specific attention paid to their—to the tax consequences to Coniston other than the discussion earlier about put rights.[7]
>
> Q. What do you mean by that, do you mean you had other plans?
>
> A. We listened to them but we didn't pay too much attention to them.
>
> Q. And why is that?
>
> A. The Board was much more comfortable with the dividend scheme, it was simple, it was fair, at least from their vantage point. We didn't believe that, aside from Coniston, there was much attention being paid one way or the other to the form of distribution. And when the stock was selling at a hundred or over, the tax consequences, as far as we were concerned, was very mixed, one method was not compelling over another.

Calhoun Dep. at 57–58. Finally, with respect to whether Coniston had ever made a de-

---

7. [This Court's footnote]. Calhoun's reference here to an earlier discussion of put rights refers to his deposition testimony wherein he relates that sometime in August or September of 1987 Coniston recommended that First Boston look at the issue of distribution by way of put rights. Calhoun stated that First Boston considered the put rights suggestion for "a month or so" and concluded against it because "[w]e thought it was very confusing. We thought it was inefficient, that there would be market imperfection and too much of the value of the distribution would be left in the market traders' hands as opposed to shareholder hands." Calhoun Dep. at 44–49. In a similar vein, Davis Polk attorney Diane Kerr testified that she researched the non-tax aspects of a put rights distribution shortly after August 19, 1987 (when she drafted an internal memorandum noting that Coniston had raised the issue and raising some initial concerns with the proposal), and "advis[ed] people internally that I thought it was not viable from a legal perspective, and that it didn't make any sense to pursue it." Kerr Dep. at 73–75. Kerr could not recall precisely when she so advised people.

mand regarding the form of distribution, Calhoun testified as follows:

> Q. Did Coniston ever suggest that unless capital gains treatment were accorded the distribution, that they would take certain actions against the companies?
>
> Mr. Silver [counsel for First Boston]: What time period?
>
> Mr. Barnhill [plaintiffs' counsel]: November, October—September, October, November.
>
> A. No.

Calhoun Dep. at 98.

UAL management also denied knowledge of Coniston's inquiries before October 29, 1987. Allegis' General Counsel Ed Hoenicke testified that although attorneys from Davis Polk reported to him quite regularly about any contact they had with Coniston and although Davis Polk kept him very well informed, he had no recollection of discussing with Davis Polk in August or September of 1987 that Coniston was looking for a capital gains transaction. Hoenicke Dep. at 58–59 [8]; see also Kane Dep. at 59 (testimony of Allegis Vice President and Secretary that he was never aware at any time prior to December 1987 that Coniston had proposed a method of distribution other than a dividend); Hobor Dep. at 41, 72 (testimony of Allegis Director of Investor Relations that the Board began to consider alternative methods of distribution in December 1987 and she was not aware that the Board considered such alternatives prior to that time; also testifying that she was not aware in August of 1987

that Coniston was requesting distribution by self-tender or put options). Finally, UAL notes that Davis Polk attorney Diane Kerr testified that "in the fall or late summer [of 1987], they [Coniston] were on a program of a dividend.... It was later that, you know, late fall, winter, where they became very interested in a tender offer." Kerr Dep. at 32. Davis Polk attorney Richard Spizzirri (who was supervising Kerr's work) testified that he was not aware of Davis Polk conducting any research subsequent to August 19, 1987 (the date of Kerr's initial memorandum) and before October 29, 1987 to determine whether a self-tender option was viable. Spizzirri Dep. at 35. Spizzirri also testified that he was not aware of any negotiations or discussions in late October between Coniston and any lawyers at Davis Polk concerning the method of distributing the divestiture proceeds. *Id.* at 49.

Plaintiffs maintain that Coniston consistently supported a self-tender beginning in August 1987. We leave aside for the moment discussion of whether "supporting" (or "expressing a preference" for) a form of distribution is equivalent to "demanding" that form of distribution and whether this distinction is material to our 10b–5 analysis. Instead, we turn to consider the actual evidence which supports plaintiffs' position.[9]

First, plaintiffs point to Allegis' Offer to Purchase, issued in February 1988, which states in pertinent part:

> Throughout the Summer and Fall of 1987, representatives of the Company and First

---

8. Significantly, the record contains a memorandum to Hoenicke from Davis Polk attorney Diane Kerr, dated September 22, 1987, that purports to summarize for Hoenicke Davis Polk's discussions with First Boston regarding the distribution of divestiture proceeds. The memorandum states, in pertinent part:

> Bob Calhoun has indicated that in his conversations with Coniston's representatives he has been told that Coniston would prefer to have the extraordinary dividends declared in 1987 but payable as early in 1988 as possible. Payment of the dividends in 1987 should minimize the taxes payable by the Allegis shareholders on the dividend distribution. Calhoun did not discuss with Coniston whether there should be one dividend or several dividends that would take into account the timing of the various divestitures.

> As a result of his discussions with the Coniston representatives Bob Calhoun has the impression that Coniston is expecting a dividend of between $60 and $65 per share.

Def.'s Facts, Ex. 20, Kerr Mem. at 1. This memorandum is admissible as evidence of what Hoenicke had been advised by Kerr as to Coniston's position *vis-a-vis* the distribution of divestiture proceeds.

9. The Court has attempted to summarize plaintiffs' most relevant evidence. The fact that every single piece of plaintiffs' evidence is not contained in the following summary does not mean that the evidence was not evaluated. The Court has fully evaluated all the evidence cited by both parties in deciding the instant motion.

Boston met from time to time with representatives of the Coniston Group to discuss the status of the Divestitures and the method for distributing to stockholders an amount equal to the net proceeds of the Divestitures, as well as the business of the Company. The Coniston Group supported the making of a cash tender offer for a significant portion of the Shares rather than payment of a dividend.

Pls.' Facts ¶ 30(A).[10]

Second, plaintiffs rely on the following testimony of Coniston principal Keith Gollust:

> I don't have any specific recollection of any ... communications [between Coniston and the Board or its advisors in the summer of 1987].... I know that our position during the summer of 1987 was that, all things considered, we had a preference for a share repurchase program.

Gollust Dep. at 160; and:

> Q. Do you recall ever deciding within Coniston that a dividend was preferable to a tender offer at any time?
>
> A. I don't believe that there was ever a time when we believed that, for Coniston, a dividend would be preferable to a transaction that would result in capital gains treatment.
>
> Q. Did you ... always believe, for one reason or another, that a tender offer was preferable to a dividend for Coniston?
>
> A. Yes.

*Id.* at 163. Gollust also testified that after the Allegis Board announced on October 29, 1987 that it was going to distribute the proceeds of the divestiture through a dividend, Coniston "stepped up our own efforts to lobby on behalf of a self tender offer." Gollust Dep. at 123 (also stating that his reaction to the announcement was that Coniston "ought to work harder on" the issue.) Plaintiffs argue that Gollust's statement that Coniston

"stepped up" its lobbying efforts implies that lobbying efforts were already underway at the time of the October 29, 1987 announcement. Further, plaintiffs note that Gollust testified that "it wasn't until the press release dated October 29th that there was any hint that the payout might be in the form of a dividend," *id.* at 182–83, and "even after we saw the press release ... indicating that the distribution would be in the form of a dividend ... it was our belief that upon a more thorough consideration, a decision would be made to do a self-tender." *Id.* at 138.

Plaintiffs also rely heavily on First Boston President Calhoun's testimony. Calhoun testified that "[Coniston] made it clear that they preferred nondividend treatment from day one until the end of the time period. They talked to us at various points through this nine-month process [the nine-month period ending with the announcement of the self-tender in February 1988] about the distributions." Calhoun Dep. at 201; *see also id* at 76 ("I don't recall them specifically asking us to explore a tender offer. They made it clear early on they preferred a capital gains treatment."); *see also id.* at 200 (testifying that, at some unspecified point in 1987, Coniston asked Allegis to distribute the divestiture proceeds in such a manner that would result in Coniston receiving capital gains treatment). Calhoun also indicated that in August or September of 1987, Coniston recommended that First Boston consider put rights (another means to obtain capital gains treatment) as a mechanism for distributing the divestiture proceeds. *Id.* at 47–49.

When asked what First Boston did in the fall of 1987 in connection with reviewing whether a tender offer should be employed as the means by which to distribute the divestiture proceeds, Calhoun testified:

---

**10.** In its Local Rule 12(N)(3)(a) statement, plaintiffs quoted this passage as follows:

> Throughout the Summer and Fall of 1987, representatives of the Company and First Boston met from time to time with representatives of the Coniston Group.... The Coniston Group supported the making of a cash tender offer for a significant portion of the Shares rather than payment of a dividend.

Pls.' Facts ¶ 30(A). By quoting the passage in this fashion (under a heading in the Rule 12(N) statement that reads "Coniston Consistently Supported a Tender Beginning in August 1987"), plaintiffs, either by design or not, invite the reading that Coniston supported the making of a cash tender offer throughout the Summer and Fall of 1987. Because we find such a reading is not compelled by the full passage, we quote the passage in its entirety in the text.

A. I can't remember anything that was done. Harry [Pinson] gave a presentation in July. I assumed we talked about this at every board meeting.

Q. That is the manner of distribution?

A. Yes, the timings, the amount.

*Id.* at 56. Shortly thereafter, Calhoun was asked whether First Boston had "gone over with the Board the pros and cons of the dividend versus the tender offer prior to mid-October?" Calhoun replied, "I don't recall specifically but I am sure that we generally spoke to them about the subject at every Board meeting that we attended starting in July." *Id.* at 78.[11]

Regarding Coniston's preference for a non-dividend distribution, the following exchange took place:

Q. [W]hat about Coniston itself ... would they have been disadvantaged by a dividend versus a tender offer in September to mid-October 1987?

A. I don't believe so.... Prior to the crash, they weren't terribly concerned with the form of the distribution.

Q. Except for the fact, as I understand it, they always asked for capital gains treatment, is that correct?

A. Not always. I don't think they always asked for it. I think they made it clear to us that they preferred it but I wouldn't characterize the conversations as always asked for it.

Q. I take it the Board was aware at the time it was occurring, the manner of distribution, that Coniston preferred capital gains treatment is that correct?

[At which point, the time frame from September to October 19th was established]

A. I don't generally recall. I know we discussed the put right notion with the Board whenever that came up and at that

stage, the Board would have been aware of it.

Q. That is it would have been aware, at the stage you discussed the put rights, that Coniston preferred capital gains treatment, is that right?

A. Correct.

*Id.* at 64–65.

Other evidence to which plaintiffs point as evidence "that Coniston consistently supported a self-tender and opposed a dividend 'throughout the summer and fall of 1987,'" Pls.' Facts ¶ 30(C), derives from the activities of Allegis' lawyers at Davis Polk. Davis Polk's Diane Kerr drafted an eight page memorandum addressed to two other partners at Davis Polk (Messrs. King and Spizzirri) dated August 19, 1987, which begins:

As you have heard, Coniston has raised a question as to how the divestiture proceeds might be distributed to Allegis' stockholders in a manner that would be tax efficient for Coniston's partners.... I thought that it would be useful to summarize for you Coniston's proposal, as well as some of the issues that are raised by the proposal. At some point after both Davis Polk and First Boston have completed their analysis of the issues, we will have to decide whether Allegis and its advisors should sit down with Coniston and try to work out a solution for the Coniston tax problem or whether we think that Allegis should simply continue its plans to distribute the proceeds of the divestitures as a dividend in respect of its common stock.

Def.'s Facts, Ex. 16, Kerr Mem. at 1. Kerr goes on to note that "Coniston has suggested that Allegis distribute to its shareholders 'put rights' in respect of its common stock," *id.* at 2, and, "Coniston also suggested that Allegis use a self tender as a means of distributing

---

11. *UAL attacks this testimony by pointing out* that Calhoun was not present at the July 30 Board meeting. Although UAL's contention that Calhoun lacks personal knowledge about the July 30 Board meeting may be correct, it is largely beside the point because Pinson, who *was* at the July 30 Board meeting, testified that he did discuss at that meeting that a self-tender offer was one method of distributing the divestiture proceeds. Pinson Dep. at 97. (Thus, UAL's assertion that "Calhoun is the only witness who recol-

lects any discussion of an alternative form of distribution at the July Board meeting," Def.'s Facts ¶ 29, is not accurate.) The record does not reflect the extent of Pinson's discussions on the topic; however, Pinson's testimony suggests that the discussions were limited. Pinson testified that he did not discuss the different tax consequences of a self-tender as opposed to a dividend distribution because "we didn't think it was an important determinant of the method of distribution." *Id.* at 98.

the divestiture proceeds." *Id.* at 7. Kerr's memorandum identifies problems with both of Coniston's proposals and states:

[A]fter both Davis Polk and First Boston have completed their analysis of the issues, we will have to decide whether Allegis and its advisors should sit down with Coniston and try to work out a solution for the Coniston tax problem or whether we think that Allegis should simply continue its plans to distribute the proceeds of the divestiture as a dividend in respect of its common stock.

*Id.* at 1.

Plaintiffs further point to the existence of two other memoranda prepared by Davis Polk attorneys during September 1987 as evidencing Coniston's opposition to a dividend and support for a tender. The first is a four page memorandum examining whether the distribution of put rights would constitute a distribution of appreciated property under the Internal Revenue Code. *See* Pls.' Facts, Ex. 4, Sept. 9, 1987 Rubenstein Mem. (stating "Allegis Corporation . . . is considering the issuance to its shareholders of a one-half put right . . . per share of its outstanding common stock"). The other examines whether the issuance of unlisted transferrable put

rights by Allegis to its shareholders must be registered under the 1933 or 1934 Securities Acts. *Id.*, Ex. 5, Sept. 19, 1987 Hansen Mem. UAL observes that these memoranda are fully compatible with its position that it considered Coniston's suggestions concerning alternative distribution methods in August and September, and found the alternatives not viable by sometime in September.

Plaintiffs specifically rely on a miscellany of Davis Polk time sheet entries reflecting work relating to tax issues raised by the divestiture distribution program. *See e.g.* Pls.' Facts, Ex. 12, Davis Polk Time Sheets at 10 (evidencing 4.8 hours of work by Kerr on 9/14/87 on "[r]esearch on various distribution mechanisms"); 32 (evidencing 10/6/87 conference between Gifford, Brillembourg, and Rubenstein re Coniston)[12]; 38 (evidencing 10/19/87 conference between Davis Polk attorneys [Kess, Kerr, Gifford, Rubenstein and others] and First Boston's Mack Rosoff, who was scheduled to meet the next day with Coniston's Keith Gollust to discuss tax implications of the distribution to UAL shareholders[13]); 41 (evidencing Kess' legal research on 10/21/87 "re w/h on self tender").[14]

Finally, plaintiffs note Gollust's testimony that it was self-evident that a majority of

---

**12.** Gifford, Brillembourg and Rubenstein were tax lawyers who worked on the self-tender. Neither Brillembourg nor Rubenstein could recall what was discussed at the October 6, 1987 meeting. Brillembourg Dep. at 100–101; Rubenstein Dep. at 28. Lydia Kess, a senior tax lawyer at Davis Polk, testified that Brillembourg worked "principally" on a tax issue described as the "substantially equivalent to a dividend test" (which concerns whether a self-tender would be afforded capital gains treatment or be treated as a dividend) but also did some unspecified work relating to the sale of nonairline assets. Kess also testified that, to her recollection, from 1987 to the spring of 1988, Rubenstein did not work on any other aspect of the United transactions than the tax consequences of divestiture distribution methods. Kess Dep. at 16–22. Kess' recollection appears to be in slight error, however, as is evidenced by the fact that Rubenstein drafted a memorandum addressing the tax consequences of different timings of dividend distributions. *See* Def.'s Reply Add'l Facts, Ex. 17.

**13.** There is no support in the record for plaintiffs' representation that the scheduled meeting between Gollust and Rosoff was for the purpose of discussing "the method of distribution" or that the meeting between Rosoff and the Davis Polk

attorneys on October 19, 1987 dealt "with this issue" as stated by plaintiffs. *See* Pls.' Mem. at 10.

**14.** UAL contends that other evidence actually confirms that Allegis' advisors were considering the *timing* of the distribution not the *method* of distribution in October 1987. For instance, on October 14, 1987, Davis Polk's Rubenstein drafted a memorandum to Lydia Kess analyzing the tax consequences of various dividend distribution timing scenarios. Def.'s Reply Add'l Facts, Ex. 17, Rubenstein Mem. On October 28, 1987, one day before Allegis announced the expected special dividends, Rubenstein sent a memorandum to Harry Pinson at First Boston expanding on her October 14 memorandum to Kerr and further analyzing the tax consequences of dividend distribution timing. *Id.*, Ex. 18. With respect to Kess' 6 minute time entry for October 21, described as "re w/h on self tender," UAL argues that the entry relates to the stock repurchase program announced the previous day to stabilize Allegis stock. UAL notes that on October 20, Kess spent one-tenth of an hour researching "mkt purch program" and argues that this entry as well as the six minute entry for October 21 relate to the repurchase plan announced on October 20.

Coniston's partners could have incurred less tax liability if the divestiture proceeds were distributed in a form other than a dividend and that Coniston was considering this as early as June of 1987. Gollust Dep. at 74–75. Similarly, Calhoun testified that it was no mystery that a "high tax basis" shareholder such as Coniston would incur a lower tax through a capital gain, rather than dividend, transaction. Calhoun Dep. at 55–56. Plaintiffs also note Oliver's testimony that the focus of Coniston's investment efforts had never before been to force a company to pay an extraordinary dividend. Oliver Dep. at 35. Plaintiffs also note the existence of a memorandum prepared by First Boston sometime in January 1988 that among other things reviews "the last ten recapitalization distributions similar to this one" and notes that "seven have been effected through self-tenders in order to afford capital gains tax treatment." Pls.' Facts, Ex. 14, First Boston Mem.

### ANALYSIS

#### Summary Judgment Standards

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the non-moving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the non-movant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14. With these standards in mind, we now consider UAL's challenges to the instant suit.

### I. Option Trader Standing under Rule 10b–5

■ UAL's first challenge to plaintiffs' complaint presents a purely legal attack. Drawing on *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and its progeny, UAL contends that the option trading plaintiffs in this action do not have standing to assert claims under Rule 10b–5.

In *Blue Chip Stamps*, the Supreme Court held that *potential* traders of securities—*i.e.*, persons who neither purchased nor sold securities but merely contemplated such transactions—lack standing to assert claims under Rule 10b–5; rather, standing only extends to actual purchasers or sellers of securities. *See Blue Chip Stamps*, 421 U.S. at 725, 730–31, 755, 95 S.Ct. at 1920, 1922–23, 1934–35. UAL correctly observes that in reaching this conclusion the Court was concerned, *inter alia*, about limiting the undue expansion of the class of plaintiffs who may sue under Rule 10b–5. The Court noted that the virtue of the rule it adopted "simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747, 95 S.Ct. at 1931. UAL seizes upon this language in arguing that the option trading plaintiffs in this action should be denied standing because they have not traded in the security to which the alleged misrepresentation relates. *See* Def.'s Mem. at 19.

Of course, three pages later in *Blue Chip Stamps,* the Court leaves no doubt that option holders may have standing as "purchasers" or "sellers" of securities to assert claims under Rule 10b–5:

> A contract to purchase or sell securities is expressly defined by § 3(a) of the 1934 Act, 15 U.S.C. § 78c(a), as a purchase or sale of securities for the purposes of that Act. Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, *the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b–5 ... because the definitional provisions of the 1934 Act themselves grant them such a status.*

*Blue Chip Stamps,* 421 U.S. at 750–51, 95 S.Ct. at 1932–33. And, as observed by the Third Circuit in *Deutschman v. Beneficial Corp.,* 841 F.2d 502, 506 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989), "[t]he only standing limitation recognized by the Supreme Court with respect to section 10(b) damage actions is the requirement that the plaintiff be a purchaser or seller of a security." Thus, *Blue Chip Stamps* did little more than limit the protections of the federal securities laws to actual participants in the securities markets. As an initial matter then, it is beyond peradventure that options are securities and option traders may assert security fraud claims.

In recognition of the fact that the Securities Exchange Act includes options within the definition of securities, UAL refines its argument and contends that option traders would have Rule 10b–5 standing, if at all, only where the defendant traded in the same option as the plaintiff or made a false statement (or material omission) about the option. *See* Def.'s Reply at 5–7. UAL contends that because it neither traded in options on Allegis stock nor made any false statement about such options, the option trading plaintiffs in the instant case should be denied standing.

The issue of whether option traders have standing to assert a private cause of action under Rule 10b–5 has been the subject of two appellate court decisions which are split on the issue, *compare Laventhall v. General Dynamics Corp.,* 704 F.2d 407, 412–14 (8th Cir.) (denying option trader standing in a Rule 10b–5 insider trading action), *cert. denied,* 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983) *with Deutschman v. Beneficial Corp.,* 841 F.2d 502, 506–07 (3d Cir.1988) (recognizing option trader standing in an action involving affirmative misrepresentation, and distinguishing *Laventhall* as involving "the analytically distinct" issue of insider trading on undisclosed information), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989), as well as numerous district court opinions which are equally split *compare, e.g., Liebhard v. Square D Co.,* 811 F.Supp. 354 (N.D.Ill.1992) (recognizing option trader standing in affirmative misrepresentation context); *Margolis v. Caterpillar, Inc.,* 815 F.Supp. 1150, 1154–56 (C.D.Ill.1991) (same); *In re Adobe Sys., Inc. Sec. Litig.,* 139 F.R.D. 150 (N.D.Cal.1991); *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712 (S.D.N.Y.1989) (recognizing option trader standing in affirmative misrepresentation action); *Tolan v. Computervision Corp.,* 696 F.Supp. 771, 774–76 (D.Mass.1988) (recognizing option trader standing in affirmative misrepresentation action); *and In re Digital Equipment Corp. Sec. Litig.,* 601 F.Supp. 311, 315 (D.Mass.1984) ("the better rule is one that recognizes that options holders have standing to sue for affirmative misrepresentations"); *with Bianco v. Texas Instruments, Inc.,* 627 F.Supp. 154 (N.D.Ill. 1985); *Lerner v. SciMed Life Sys., Inc.,* Fed. Sec.L.Rep. (CCH) ¶ 98,232, 1994 WL 374319 (D.Minn.1994) (denying option trader standing in a nondisclosure action under the authority of *Laventhall* ); *In re McDonnell Douglas Corp. Sec. Litig.,* 567 F.Supp. 126 (E.D.Mo.1983) (same); *Data Controls North, Inc. v. Financial Corp. of America, Inc.,* 688 F.Supp. 1047 (D.Md.1988), *aff'd without opinion,* 875 F.2d 314, 1989 WL 50223 (4th Cir.1989); *and Starkman v. Warner Communications, Inc.,* 671 F.Supp. 297 (S.D.N.Y. 1987).[15] As the number of divergent opin-

---

**15.** The issue has also been the subject of law review commentary. *See* Note, *Private Causes of*

ions might suggest, the arguments on both sides of this issue have been have been thoroughly framed, and we do not intend to rehash them in detail here. As discussed below, we reject UAL's position and join with those courts and commentators recognizing option trader standing under Rule 10b–5.

Apart from *Blue Chip Stamps'* limitation on extending standing to only those who have actually purchased or sold securities, the Supreme Court has recognized, albeit in a different context, that "a section 10(b) action can be brought by a purchaser or seller of 'any security' against 'any person' who has used 'any manipulative or deceptive device or contrivance' in connection with the purchase or sale of a security." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 386, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983). Courts that have denied standing to option traders have most typically, although not exclusively, done so in the context of insider-trading/nondisclosure actions as opposed to affirmative misrepresentation cases. *See, e.g., Laventhall,* 704 F.2d at 412–14; *but see Bianco,* 627 F.Supp. at 161 (declining to recognize a distinction between affirmative misrepresenta-

tion cases and nondisclosure cases and therefore applying the same rule in both).

In denying option trader standing in *Laventhall,* the Third Circuit first reasoned that corporations do not stand in a fiduciary relation or other similar position of trust and confidence to option traders; hence, corporate insiders owe no special duty to disclose inside information to option holders. *Laventhall,* 704 F.2d at 410–11. Thus, under *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (holding that one commits securities fraud by failing to disclose material information prior to the consummation of a transaction only when under a duty to disclose), corporate insiders could not be liable to option holders for failing to disclose material information before trading—they are "complete strangers and ordinarily no duty would be owed." *Laventhall,* 704 F.2d at 412. Next the *Laventhall* court asserted that "[t]he *sine qua non* in every private action under section 10(b) is unauthorized trading of securities in the same market as the persons damaged." *Laventhall,* 704 F.2d at 412.[16] Proceeding from

*Action for Option Investors Under SEC Rule 10b–5; A Policy, Doctrinal, and Economic Analysis,* 100 Harv.L.Rev. 1959 (1987) (arguing that option holders should be allowed to sue under section 10(b) *to the same extent as* shareholders); Elizabeth M. Sacksteder, Note, *Securities Regulation for a Changing Market: Option Trader Standing Under Rule 10b–5,* 97 Yale L.J. 623 (1988) (same); *cf.* Donald C. Langevoort, *Insider Trading and the Fiduciary Principle: A Post–Chiarella Restatement,* 70 Cal.L.Rev. 1, 42 (1982) (discussing application of the insider trading rule enunciated in *Chiarella v. United States* to the options context and observing that "a narrow reading of *Chiarella,* foreclosing application of the abstain-or-disclose rule to options trading, would open a large loophole for insiders to profit from confidential information").

**16.** In support of this proposition, the court cited *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 169 (2d Cir.1980), also an insider trading case (or more precisely a tippee trading case). We are at somewhat of a loss in understanding the *Laventhall* court's reference to *Elkind;* the case certainly does not directly assert that "[t]he *sine qua non* in every private action under section 10(b) is unauthorized trading of securities in the same market as the persons damaged." And, we find no basis for inferring such a general proposition from the opinion. At most, the *Elkind* opinion implies that trading on the same market by the plaintiff and an insider is necessary for an insid-

er trading cause of action. At the specific page cited by the *Laventhall* court, the *Elkind* opinion discusses the proper measure of damages in an insider trading case. In this context, the *Elkind* court discusses an investor's entitlement "to an honest market in which those with whom they trade have no confidential corporate information," 635 F.2d at 169, and the court further observes:

The reason for the "disclose or abstain" rule is the unfairness in permitting an insider to trade for his own account on the basis of material inside information not available to others. The tipping of material information is a violation of the fiduciary's duty but no injury occurs until the information is used by the tippee. The entry into the market of a tippee with superior knowledge poses the threat that if he trades on the basis of the inside information he may profit at the expense of investors who are disadvantaged by lack of the inside information.

*Id.* From such language, it is perhaps fair to infer that trading on the same market is necessary to an insider trading case; we need not decide, however, whether this is true. For our present purposes, it is sufficient to note that *Elkind* was explicitly discussing only the requisites of an insider trading action—the opinion does not purport to be about affirmative misrepresentation actions; and, thus, *Laventhall's* assertion regarding the *sine qua non* of a 10(b) action should similarly be understood as limited to insider trading actions.

this first premise, the *Laventhall* court concluded that there is no "transactional nexus" between corporate-insider trading on the stock market and option trading on the options exchange:

> There is only a speculative relationship between the insider's trading and the alleged loss caused to the options holder. It may be true that the nondisclosure may have had some indirect effect on the option premium, but the insider's trading of stock on the stock market has no transactional nexus with the option holder's loss on the options exchange.... Here defendant's purchase of stock, if done wrongfully as claimed, could not in any way be asserted as the basis for plaintiff's alleged loss because the parties were not dealing in the same market.

*Id.* Thus, the transactional nexus required by the *Laventhall* court amounts to trading on the same market by the plaintiff and the insider. Clearly, such a requirement was fashioned, and only makes sense, in the context of an insider trading action. Although it is not at all clear how such an insider-trading requirement would be transposed to the affirmative misrepresentation context in which there are no allegations that the defendant engaged in any trading,[17] UAL contends that *Laventhall*, and subsequent opinions follow-

ing it, should guide the decision in the instant case. Because we find the rule articulated in *Laventhall* to be inapposite outside the insider trading context, we decline to follow it in the instant affirmative misrepresentation case.[18]

Instead, we find that the Third Circuit's opinion recognizing option trader standing in *Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir.1988), is on-point and reaches the correct result. *Deutschman*, like the instant case, involved allegations of affirmative misrepresentation and no insider trading. Thus, at the outset, the court distinguished *Laventhall*:

> the *Laventhall* holding, like the *Chiarella* and *Dirks v. S.E.C.*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 holdings, is simply not relevant to the distinct issue of affirmative misrepresentations affecting a market in securities. No Supreme Court case and no Court of Appeals case has ever imposed a transactional nexus requirement in a section 10(b) affirmative misrepresentation case.

*Deutschman*, 841 F.2d at 507. We agree with the Third Circuit that the standards articulated in the insider trading context do not generalize to the affirmative misrepre-

---

**17.** As noted above, UAL suggests that option traders would have standing, if at all, only where the defendant actually traded in options. That option trader standing does exist in such circumstances should be rather uncontroversial in view of § 20(d) of the Insider Trading Sanctions Act of 1984, which provides as follows:

> Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provision of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, [or] option ... shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

Pub.L. 98–376, 98 Stat. 1265 (1984) (codified at 15 U.S.C. § 78t(d)). *See* William K.S. Wang, Commentary, *A Cause of Action for Option Traders Against Insider Option Traders*, 101 Harv. L.Rev. 1056 (1988).

Alternatively, UAL suggests that in order for an option holder to have standing to assert an affirmative misrepresentation claim, the misrepresen-

tation must be about the option itself. We are aware of no basis in law for such a position. Surely, in the equity security context there is no requirement that the alleged misrepresentation be about the stock itself. The only possible rationale for such a position lies in the policy considerations militating in favor of limiting the scope of liability under Rule 10b–5. We address these considerations *infra*.

**18.** This is not to say, however, that there need be no "transactional nexus" between the defendant's conduct and the plaintiff's injury; we simply find that the *Laventhall* nexus is inapposite in the fraud on the market context. Underlying the fraud on the market theory is the fundamental premise that open and fair markets contain and convey important valuation information upon which investors rely. *See Basic v. Levinson*, 485 U.S. 224, 241–47, 108 S.Ct. 978, 988–92, 99 L.Ed.2d 194 (1988). That reliance provides the causal connection (or transactional nexus) between the defendant's fraud and the plaintiff's purchase of securities. We find that such a causal connection constitutes sufficient transactional nexus to support the option trader's claim.

sentation context.[19]  *See Liebhard*, 811 F.Supp. at 355–56 (declining to follow district courts that have denied option trader standing in the affirmative misrepresentation context, noting that "their reliance on *Laventhall* and *Chiarella* [is] misplaced"); *Margolis*, 815 F.Supp. at 1156 (recognizing option trader standing in the affirmative misrepresentation context, noting "This Court believes there is a clear distinction between omissions and affirmative misrepresentations.")

Next, the court turned to address the policy argument—advanced by UAL in the instant case—that corporations should "be insulated from liability to option traders because otherwise there would be no end to their potential liability."[20]  *Id.* at 507.  The court rejected this argument as "chimerical," observing that *Blue Chip Stamps* "confined section 10(b) liability to members of the precise class for the protection of which the 1934 Act was enacted: participants in the national securities markets.  Options traders are participants in those markets."  *Id.*  And, the court further observed that additional protection against unlimited liability is afforded by the proximate cause requirement of Rule 10b–5 liability.  We concur with the Third Circuit's judgment that *Blue Chip Stamps* has properly set the purchase or sale of a security as the threshold for 10b–5 standing and there is no compelling justification for raising that threshold so as to exclude option traders.  We find no sound basis to conclude that recognizing option trader standing represents the sort of undue expansion of civil liability sought to be avoided in *Blue Chip Stamps*.

We are also unpersuaded by UAL's intimations that, as a matter of policy, option traders should not have standing because they are mere speculators who contribute no equity to the issuing corporation.  In the first place, the fact that option traders contribute no equity to the issuing corporation has been used principally as a justification for the conclusion that the issuer owes no fiduciary duty to the option holder.  For instance, in *Laventhall* the court observed:

> It is fundamental for our understanding that the purchase of the options did not represent contribution of capital to the corporation. . . .  '[T]he options trader has no equity interest in the corporation by virtue of his selling or purchasing an option on the corporation's stock.  He is owed no special duty by the officers and directors of the corporation because, quite simply, the corporation is not run for his benefit.

704 F.2d at 411 (quoting *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1184 (S.D.N.Y.1981)).  However, as we have seen, the existence *vel non* of a fiduciary duty is relevant only in the insider trading

**19.**  Insofar as this Court diverges on this point from Judge Grady's opinion in *Bianco*, we respectfully disagree.

**20.**  The fundamental notion underlying UAL's contention that recognition of option trader standing would result in potentially limitless liability for issuers of the underlying security is that the issuers, as a general matter, do not write the options and hence have no control over the number of options on the market.  However, we concur with the analysis of one commentator who noted:

> there is no reason why the ability to control the magnitude of liability should be a prerequisite for amenability to suit under Rule 10b–5.  The Rule addresses not mere negligence but knowing fraud. . . .  The defendant can control the extent of liability simply by refraining from engaging in the fraud.

Sacksteder, *supra* note 15, at 634 n. 67.  Moreover, it is worth noting that the SEA is "chiefly concerned with the regulation of post-distribution trading," *Blue Chip Stamps*, 421 U.S. at 752, 95 S.Ct. at 1933, and once a security reaches the secondary market, there is a sense in which the issuer's potential liability is similarly beyond its control:  The issuer has no control over the number of times a share is traded (thus, the number of potential plaintiffs is beyond the issuer's control) or the price at which the stock is trading (thus, the amount of potential damages is largely beyond the issuer's control).  *See* Sacksteder, *supra* note 15, at 634 n. 67 ("[T]he corporation's ability to control the extent of its liability to stockholders under Rule 10b–5 is scarcely greater.  Once the firm's stock reaches the secondary market, its price is beyond the issuer's control.").  At most, all that can be said is that the potential number of traders and the potential amount of damages is *some* function of the number of shares initially issued.  In view of the issuer's lack of ability to control its liability even in the context of Rule 10b–5 actions by stock traders, we find the argument that recognizing option trader standing will lead to limitless liability to be exaggerated.

context, not the affirmative misrepresentation context.

Furthermore, the purpose of the antifraud provisions of the SEA is not simply limited to protecting those who contribute equity by purchasing stock on the market; in addition, those provisions are designed to protect the integrity of the market itself. *See Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971); *United States v. Brown,* 555 F.2d 336, 339 (2d Cir.1977); *cf. United States v. Naftalin,* 441 U.S. 768, 774, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979) (noting that investor protection was not the sole purpose of the Securities Act, and that an effort to achieve a high standard of business ethics was also a key factor). We find no basis to conclude that the options market is any less deserving of such protection. Indeed, Congress' 1982 amendment to section 3(a)(10) of the SEA so as to explicitly include "any put, call, straddle, option, or privilege on any security" [21] within the definition of a security militates strongly against such a conclusion.

Finally, we note that notwithstanding the derisive characterization—made by several courts and echoed by UAL—of option traders as "speculators," it is commonly recognized that options markets serve valuable functions *vis-a-vis* the stock market [22] such as transferring risk from the stock market and increasing the efficiency of the stock market.[23] *See, e.g., Deutschman,* 841 F.2d at 504 (noting that option contracts "permit investors to hedge against future movements in the market price of securities"); SPECIAL STUDY REPORT, *supra* note 5, at 107–14 (discussing common strategies for utilizing options, including the use of options as a hedge against loss in the securities market); Rubinstein, *supra* note 22, at 54, 57 (noting that

options provide a mechanism of reducing loss in the securities market and that the options market adds efficiency and liquidity to the stock market); *Options Primer, supra* note 5, at 13–14 (discussing investment strategies, including the use of options as a hedge against loss in the securities market). Our recognition of the useful functions of options and the options market bolsters our conclusion that option traders are entitled to standing to assert a Rule 10b–5 claim.

## II. UAL's Challenges to the Sufficiency of Plaintiffs' Evidence

"In general, to prevail on a Rule 10b–5 claim, a plaintiff must prove that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plaintiff's injury." *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995). An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

In the instant case, UAL moves for summary judgment contending that (1) there is no evidence that Coniston ever demanded a nondividend distribution or that negotiations over such a demand were ongoing and Allegis' failure to disclose that Coniston had expressed a preference for a self-tender or put rights was immaterial; (2) there is no evidence that Allegis was analyzing various distribution methods as of October 29, 1987, and in any event, Allegis' failure to complete

---

**21.** Pub.L. 97–303.

**22.** For a discussion of the useful social functions of option markets generally, see Mark Rubinstein, *An Economic Evaluation of Organized Option Markets,* 2 J. COMP.CORP.L. & SEC.REG. 49, 54–57 (1979) (hereinafter "Rubinstein").

**23.** In the closely analogous context of commodities futures trading, Judge Posner has recognized these same functions served by futures trading:

Commodity futures trading serves a social function other than to gratify the taste for taking risks—two other social functions in fact. It increases the amount of information that the actual consumers of the commodity ... have about future price trends.... And it enables the risk averse to hedge against future uncertainties.

*United States v. Dial,* 757 F.2d 163, 165 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

an analysis of the best distribution method (and the failure to disclose this fact) is not actionable under Rule 10b–5.

### 1. *UAL's Failure to Disclose the Coniston Demand and Negotiations*

Plaintiffs contend that Allegis' October 29, 1987 announcement was materially misleading because it failed to disclose that Allegis was secretly negotiating with Coniston over Coniston's demand that the divestiture proceeds be distributed as a buyback of shares rather than a special dividend. UAL disputes that Coniston had made such a demand or that any negotiations over the form of the distribution were ongoing as of October 29, 1987. UAL contends that, although Coniston had suggested (or expressed a preference for) nondividend distribution in August 1987, Allegis' advisors had rejected such a proposal by September 1987 and no negotiations on this issue were ongoing at the time of the October 29, 1987 announcement. Also, UAL contends that Allegis' failure to disclose Coniston's suggestion (or preference) was immaterial.

As the foregoing recitation of facts indicates, although plaintiffs deposed all three of Coniston's principals—Paul Tierney, Gus Oliver, and Keith Gollust—not one testified that Coniston had demanded a self-tender prior to October 29, 1987. Indeed, Oliver was not even willing to go so far as to say that Coniston "suggested" a self-tender: "I am not sure I would use the word 'suggest.' A capital gains type of transaction was certainly discussed." Also, Gollust testified that prior to the stock market crash, Coniston was "relatively indifferent" to the form of distribution, and Oliver echoed this sentiment stating that before the crash, the form of distribution "was not really a critical question." The undisputed testimony of these Coniston principals reflects that prior to the crash, Coniston believed, rightly or wrongly, that if Allegis chose to distribute the divestiture proceeds in the form of a dividend, Coniston could achieve the tax treatment it desired simply by selling its shares in what it believed to be a very liquid market. Of course, the stock market crash may have changed the analysis dramatically, but the

point remains that the testimony of the Coniston principals provides no support for, and in fact flies in the face of, plaintiffs' contention that Coniston had demanded a self-tender or that the form of distribution was of great moment to Coniston prior to the Board's announcement on October 29, 1987. Plaintiffs argue that the crash occurred ten days before the Board's October 29, 1987 announcement and hence Coniston's position on the form of distribution correspondingly changed prior to the announcement. While that may be the case—we say *may* because plaintiffs have not directed the Court to any evidence that Coniston evaluated the effect of the market crash on its Allegis position between October 19, 1987 and October 29, 1987—there is not a shred of evidence in the record suggesting that Coniston communicated with the Allegis Board or its advisors and apprised them of the new significance of the issue during those ten days.

In their memorandum opposing defendant's motion for summary judgment, plaintiffs argue that "a reasonable investor would find Coniston's two months of continuous opposition to a dividend and support for a tender material." Pls. Mem. at 42 n. 20. When expressed in this fashion, plaintiffs' argument appears to have some force; however, that appearance is rendered illusory by the lack of evidence supporting the proposition that Coniston meaningfully opposed a dividend and conveyed that opposition to Allegis or its advisors.

The testimony of the Allegis Board members and management as well as that of Allegis' advisors at First Boston and Davis Polk also fails, by and large, to support plaintiffs' position that a demand was made or that negotiations were ongoing. Prior to October 29, 1987, there is no mention in the Board records reflecting the Board's consideration of alternative forms of distribution; nor is there any hint that Coniston had pressed for a nondividend distribution. All of the Allegis Board members who were deposed in this matter denied any recollection of being informed that Coniston had sought a nondividend distribution prior to the October 29, 1987 announcement. Also, various members of Allegis' management testi-

fied that Allegis did not begin to consider alternative distribution methods until December of 1987. Corroborating the testimony of the Board members and management, General Counsel Hoenicke testified that he did not think he ever discussed the dividend versus tender offer issue with the Board prior to December of 1987. Similarly, First Boston's Harry Pinson testified that prior to October 1987, he never discussed the different tax consequences of a self-tender versus a dividend with the Board. And First Boston's Robert Calhoun testified that he did not believe that there was any specific attention paid to Coniston's tax consequences prior to the stock market crash.

Faced with this overwhelming array of damaging testimony, plaintiffs attempt to undermine it by arguing that all of the Allegis Board members, Allegis management, and Allegis agents at First Boston and Davis Polk lack credibility because their interests obviously lie with the defendant. Similarly, plaintiffs attack the credibility of the Coniston partners, asserting that they are "motivated to soft-sell" the facts because at the time of their depositions "Coniston remained a large shareholder, had made its peace with defendant and occupied seats on its Board." Pls.' Facts ¶ 30H. As the Seventh Circuit has observed, however, "[a] motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit." *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988); *see also Trans–Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1257 (7th Cir.1989) (citing *Walter* where credibility of deposition testimony was attacked in opposition to summary judgment motion). *Walter* and *Trans–Aire* are not directly applicable, of course, because plain-

tiffs here do not *merely* challenge the credibility of the foregoing testimony; in addition, they look to a variety of other evidence which they contend creates a genuine issue of material fact as to whether Coniston demanded a buy-back and whether negotiations over this demand were ongoing as of October 29, 1987. We now evaluate that evidence.

The most direct evidence in support of plaintiffs' position is, perhaps, the testimony of First Boston's Robert Calhoun, who stated that, although he did not "remember specifically," he was "sure that we generally spoke to them about the subject [the pros and cons of the dividend versus the tender offer] at every board meeting that we attended starting in July." Calhoun Dep. at 78. Also, Calhoun testified that he "assumed" that First Boston talked about whether a tender offer should take place in connection with the distribution "at every board meeting" in the fall of 1987.[24] *Id.* at 56. The Court finds Calhoun's testimony insufficient to raise a genuine issue for a variety of reasons. First, Calhoun himself readily acknowledges that he has no specific recollection of discussing distribution alternatives and that his testimony reflects an assumption as to what was discussed. Second, Calhoun's lone testimony, at most, raises a question as to whether distribution alternatives were generally discussed at the Board meetings. This, however, is not a material question in the context of this lawsuit. The material questions are whether the Board was advised that Coniston had demanded a self-tender and whether negotiations over such a demand were ongoing as of October 29, 1987. Calhoun's testimony does not speak to either of these issues and thus does not raise a genuine question as to them.

24. Calhoun's precise testimony was actually as follows:

Q. Now, could you tell us what you did in the fall, what First Boston did in the fall of 1987, that is September on, in connection with reviewing whether a tender offer should be— should take place in connection with the distribution.

. . . . .

Q. How about September 1st through September 14?
A. I can't remember anything that was done. Harry [Pinson] gave a presentation in July. I

assumed we talked about this at every board meeting.
Q. That is the manner of distribution?
A. Yes, the timings, the amount.
Calhoun Dep. at 56. Thus, in view of his final qualification ("the timings, the amount"), it is somewhat of a stretch to assert, as we have done in the text, that Calhoun testified as to "whether a tender offer should take place in connection with the distribution" at every Board meeting. However, for purposes of this discussion we must read the testimony in the light most favorable to the plaintiffs.

To avoid any confusion, we should note that a fair reading of the record supports plaintiffs' contentions that the Board was generally aware that a self-tender was available as an alternative means of distributing the divestiture proceeds and that the Board, or at least some members, were apprised by First Boston in about August of 1987 that Coniston had asked First Boston to explore the possibility of distributing the divestiture proceeds through offering put rights. However, the uncontroverted record also indicates that this latter option was explored and rejected by Allegis' advisors shortly thereafter. The record provides no support for the position that Coniston's posture with respect to the put rights possibility was a demand or anything close to a demand. Nor does the record support the idea that the Allegis Board ever took such a proposal under consideration. When asked what happened to the idea of put rights, Pinson responded that "we [First Boston] thought about it and dismissed it ... because we didn't see any advantages to the dividend device." Pinson Dep. at 143. Calhoun testified that First Boston explored the issue for "a month or so" and concluded against it. *See* Calhoun Dep. at 44–49. Similarly, Davis Polk attorney Diane Kerr testified that she first heard that Coniston was trying to find a distribution method other than a dividend in August 1987; shortly thereafter, she conducted an analysis of the non-tax aspects of whether a put rights offering would work and concluded that "it was not viable from a legal perspective, and that it didn't make any sense to pursue it." Kerr Dep. at 33, 75.

Similarly, Keith Gollust's testimony does very little to raise a triable issue. In the first place, Gollust's testimony that "all things considered, [Coniston] had a preference for a share repurchase program" and that Coniston always believed that a tender offer was preferable to a dividend, Gollust Dep. at 160, 163, cannot be read in isolation from his testimony that during June, July and August, Coniston was "relatively indifferent between a cash tender offer or a dividend." *Id.* at 116. Nor can it be read in

isolation from Oliver's testimony that "it wasn't until some time after the crash that the issue became significantly more important to [Coniston]," Oliver Dep. at 38, and that prior to the crash the prospect "of being forced to sell in the market [to avoid the tax consequences of a dividend and achieve capital gains treatment], if it arose at all, was not a very consequential issue" and if the issue was considered "we didn't consider it to be a matter of great consequence." *Id.* at 52. Thus, while Coniston might have preferred a nondividend distribution prior to the crash, the undisputed testimony of Coniston's principals is that the strength of that preference was minimal. And, again, Coniston's preference *per se* is not the material issue here; rather, it is whether Coniston was pressing this issue with the Allegis Board and whether Coniston's preference was the subject of negotiation between Coniston and Allegis. With respect to these critical issues, plaintiffs have made no showing.[25] In this regard, it can hardly go without saying that there is not a single piece of direct evidence reflecting the existence of any negotiations, prior to October 29, 1987, between Allegis and Coniston over the form of the divestiture distribution. Indeed, all indications are to the contrary; for instance, Gollust's testimony leaves little room to conclude that negotiations (pre-October 1987) concerning the form of distribution followed Coniston's initial requests in August 1987 that a nondividend method of distribution be explored:

Q. Do you recall [First Boston and Davis Polk] getting back to you after you raised the question in ... July or August of 1987?

A. I don't have any specific recollection.

Q. Do you recall them indicating to you they were studying the matter?

A. During that time period, I don't have any specific recollections of any specific conversations with any one at First Boston or Davis Polk on the subject.

Q. Do you recall believing that they were studying the method of divestiture in July or August 1987?

---

25. The Court has also considered the other testimony of Gollust cited by the plaintiffs and finds it too insignificant to raise a triable issue.

A. I don't recall.

Gollust Dep. at 158. Although this testimony plainly leaves open the possibility that such talks did occur but Gollust simply could not remember them, the fact remains that no other evidence in the record substantiates the alleged existence of ongoing—pre-October 29, 1987—negotiations over this issue.

Finally, we pause briefly to comment on some of the remaining contentions raised by plaintiffs. First, plaintiffs have directed the Court to various portions of the record indicating that Allegis negotiated a standstill agreement with Coniston before finally approving a tender offer. Indeed, the record reflects that the Allegis Board was unwilling to approve a tender offer absent a standstill agreement from Coniston, see, e.g., Calhoun Dep. at 120–21 ("It was always clear if we went to the tender offer, we would require a standstill"); and, plaintiffs have pointed out that Allegis and Coniston were negotiating a standstill agreement as early as October 19, 1987. See Pls.' Facts, Ex. 6. Thus, plaintiffs invite the inference that Allegis and Coniston were negotiating over the form of the distribution at least as early as October 19, 1987. However, that inference is not compelled or even supported by the record. Instead, the undisputed evidence in the record indicates that the standstill agreement that was being negotiated in October and November of 1987 was unrelated to the issue of the form of the distribution. As Davis Polk's Kerr testified:

> On November 23rd, there had been no decision by the company to pursue a self-tender or any decision by advisors to even consider that. So that the conversations with Coniston, there were ongoing conversations about a standstill. But the conversations did not discuss the issues of what Coniston would or would not do in a self-tender. That had not been something recommended by advisors, much less something considered by the company.
>
> Q. What were the issues that the company was seeking from Coniston in connection with the standstill at this point in time?
>
> A. Ceasing consent solicitations; not acquiring additional shares; stopping their litigation; in general signing onto the

board's program. The board had adopted the divestiture program that Coniston had been pushing and yet Coniston, nonetheless, continued to cause ruckus among the shareholders.... There were a series of letters to the board; there were conversations through First Boston demanding more money, demanding leverage of the airlines, demanding board seats, demanding representation, demanding management changes. They continued their efforts to lobby to get even greater value immediately than that which was encompassed within the divestiture program.

Kerr Dep. at 96–97. There is simply no probative evidence in the record suggesting a connection between the standstill negotiations taking place in October–November 1987 and the subsequent standstill negotiations associated with the Board's decision to use a self-tender as the means to distribute the divestiture proceeds.

The Court has painstakingly scrutinized the Davis Polk time sheet entries upon which plaintiffs rely to invite the inference that Davis Polk was researching the self-tender issue throughout September and October 1987. Admittedly, the time entries admit of some uncertainty. For instance, Kess' six-minute entry for October 21 described as "LR re w/h on self tender" could relate to the divestiture self-tender, as suggested by plaintiffs, or it could relate to the share repurchase announced by the Board the previous day, in the wake of the market crash, designed to stabilize trading in Allegis stock. Similarly, even if Gifford's October 6 entry reflecting a meeting with Rubenstein and Brillembourg described as "(Conniston [sic]) cw Brillembourg and Rubinstein" relates to Coniston's tax problems, as plaintiffs suggest, it is not at all clear that this tax problem related to the *form* of the distribution as opposed to the *timing* of the distribution. That this October 6, 1987 conference may have related to the timing issue, as suggested by defendants, receives some support from the fact that less than two weeks later, Rubenstein drafted a memorandum analyzing shareholders' tax liability under six different dividend timing scenarios. See Def.'s Reply Add'l Facts, Ex. 17. On a motion for sum-

mary judgment, however, the Court must resolve these ambiguities in favor of the plaintiffs; hence, we must conclude that these entries reflect some activity at Davis Polk relating to consideration of the self-tender option—perhaps, in connection with an awareness of the adverse tax consequences to Coniston of a dividend distribution. However, even granting plaintiffs this inference, this evidentiary showing is insufficient to raise a triable issue. In view of all the circumstances giving rise to Allegis' divestiture program, it would be somewhat surprising for the entire program to proceed to completion without any of Allegis' advisors who were working on the program to consider and discuss the effects of the distribution method on the company's largest shareholder—and nemesis—Coniston. Accordingly, the fact that there is some mention of Coniston in the Davis Polk time sheets is simply not probative of whether Coniston had made a demand upon Allegis over which the parties were engaged in negotiations; nor can Kess' six-minute entry support such an inference.

In the final analysis, it strains credulity to suggest, as plaintiffs do, that negotiations between Coniston and Allegis took place over a several month period preceding October 29, 1987, and yet not a single witness could testify as to the existence of such negotiations nor could a single document memorializing such negotiations be produced. Following this Court's thorough review of all of the evidence and arguments presented by plaintiffs, we are unable to conclude that plaintiffs' showing is sufficient to raise a genuine issue of material fact as to whether Coniston had demanded a nondividend distribution of the divestiture proceeds, or whether Coniston and Allegis were negotiating such a demand, as of October 29, 1987. Accordingly, the Court must grant summary judgment in favor of UAL on count I of plaintiffs' amended complaint.

### 2. UAL's Failure to Disclose its Failure to Complete Distribution Analysis

Plaintiffs also contend that Allegis' October 29, 1987 announcement was false and misleading because it failed to disclose that Allegis had not yet completed its study of the best method of distribution. *See* Am.Compl. ¶ 49 (referring to "defendant's failure to disclose that it had not yet completed the analyses necessary to determine whether to distribute the divestiture proceeds through a buyback or a dividend"); Pls.' Mem. at 31 ("The announcement was subject to the completion of defendant's study of the best method of distribution which had not been completed.") UAL argues that this claim is fatally deficient for one of two reasons: either (i) plaintiffs are claiming that Allegis' analysis was ongoing as of October 29, 1987, in which case summary judgment should be entered because there is no evidence that any analysis was ongoing at that time, or (ii) plaintiffs are claiming that Allegis failed to conduct a proper analysis until after that time, in which case summary judgment should be entered because plaintiffs are attempting to bootstrap a state law breach of fiduciary duty (duty of due care) claim into a federal securities law claim by alleging the nondisclosure of the Board's alleged negligence. *See Santa Fe Indus. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

Plaintiffs apparently accede to UAL's either/or characterization of their claim; however, they contest UAL's conclusions, asserting that (i) the evidence establishes that Coniston's dividend announcement was "subject to the completion of defendant's study of the best method of distribution," Pls.' Mem. at 31, and Allegis' failure to disclose this fact rendered the October 29, 1987 dividend announcement false and misleading; and (2) *Santa Fe* does not preclude their claim. Unfortunately, while not objecting to UAL's characterization of their claim, plaintiffs make no effort to clarify the precise nature of that claim—that is, whether their contention is that analysis was ongoing but not yet complete or that Allegis had not conducted any analysis. The expression used in plaintiffs' memorandum—namely, that "the announcement was subject to the completion of defendant's study"—does nothing to clarify the matter. Accordingly, we examine the viability of plaintiffs' claim under both interpretations.

(i) *Were Allegis' Analyses On–Going as of October 29, 1987*

Plaintiffs' position appears to be that Allegis' analyses were on-going as of October 29, 1987. For instance, plaintiffs assert, "Instead of being concluded in August, defendant's analyses were not completed until January 1988." Pls.' Facts ¶ 32. The most probative evidence offered by plaintiffs in support of this assertion derives from the August 19, 1987 memorandum prepared by Davis Polk attorney Diane Kerr, which discusses Coniston's suggestions regarding non-dividend distribution methods and which states, in pertinent part:

> At some point after both Davis Polk and First Boston have completed their analysis of the issues, we will have to decide whether Allegis and its advisors should sit down with Coniston and try to work out a solution for the Coniston tax problem or whether we think that Allegis should simply continue its plans to distribute the proceeds of the divestitures as a dividend in respect of its common stock.

Def.'s Facts, Ex. 16, Kerr Mem. at 1. When Kerr was asked, "At what point did Davis Polk and First Boston complete the analysis of the issues that you referred to in this sentence?", she answered, "In January of 1988." Kerr Dep. at 30. However, in selectively abstracting this excerpt from Kerr's deposition transcript, plaintiff wholly disregards Kerr's subsequent testimony:

> A. [T]he first suggestion of a self-tender was made in August, or I was informed by First Boston that Coniston had suggested this. There was no discussion of it at that time, other than awareness on all our parts, that that type of thing made no sense in the context of the business objectives and the timing of the program. And then there was no discussion of it until late fall.
>
> Q. So when you first heard about this in August, you did not do any research or additional analysis, other than to think it was an inappropriate procedure?
>
> A. No. It made no sense, in the context we were operating at that time.
>
> Q. When did you first start to re-examine this issue?

> A. Late fall.... After the crash sometime, you know, late Novemberish, Decemberish; something in that time period, but I'm not sure exactly when it was.

Kerr Dep. 85–87. The almost complete absence of any Davis Polk time entries, after mid-September and prior to the crash, evidencing research on the form of distribution issue substantiates Kerr's testimony that the issue was not seriously explored until after the crash. When read in conjunction with her subsequent testimony, it is clear that Kerr's statement—*i.e.*, that Davis Polk and First Boston completed their analysis in January 1988—was not intended to imply that an ongoing analysis was finally completed in January 1988; rather, the statement can only reasonably be understood as meaning that the analysis—discontinued early on but rekindled after the crash—was not completed until January 1988. In short, the Court finds that Kerr's testimony, when read in the context of her entire testimony, provides merely colorable evidence of an ongoing investigation and hence is insufficient to raise a genuine question of material fact as to this issue. Additionally, the Court finds absolutely no support in the record for plaintiffs' contention that the Board's announcement on October 29, 1987, "was subject to the completion of [its] study of the best method of distribution."

(ii) *Does* Santa Fe *Bar Plaintiffs' Claim*

In view of the absence of any triable issue as to whether there was any ongoing analysis of the best distribution method as of October 29, 1987, UAL argues that to the extent plaintiffs' claim is predicated on the Board's failure to disclose that it had not analyzed the best distribution method, such a claim is barred by *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), because the allegations simply amount to a claim that the Board failed to disclose its own breach of fiduciary duty.

In *Santa Fe*, the Supreme Court refused to recognize a cause of action under Rule 10b–5, where the underlying conduct giving rise to the complaint allegedly amounted to a breach of fiduciary duty without any deception, misrepresentation, or nondisclosure.

*See* 430 U.S. at 476, 97 S.Ct. at 1302. *Santa Fe* involved an alleged breach of fiduciary duty owed by majority shareholders to minority shareholders in effecting a Delaware statutory short-form merger. In relevant part, the minority shareholders alleged that the merger had no justifiable business purpose and was effected only to eliminate the minority from the company. *Id.* at 467–68, 97 S.Ct. at 1297–98. The district court dismissed the claim and the Second Circuit reversed, holding "that a complaint alleges a claim under Rule 10b–5 when it charges, in connection with a Delaware short-form merger, that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose." *Id.* at 470, 97 S.Ct. at 1299 (quoting lower court). The Supreme Court reversed, noting that "the claim of fraud and fiduciary breach in this complaint states a cause of action under any part of Rule 10b–5 only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Id.* at 473–74, 97 S.Ct. at 1301. Because the majority shareholder's conduct was determined to involve neither manipulation nor deception, it was not actionable under Rule 10b–5.

Following *Santa Fe*, the Seventh Circuit has recognized on several occasions that claims of corporate mismanagement and/or breach of fiduciary duty by corporate directors are not actionable under the anti-fraud provisions of the securities laws. *See, e.g., Davidson v. Belcor, Inc.,* 933 F.2d 603, 605 n. 3 (7th Cir.1991); *Kademian v. Ladish Co.,* 792 F.2d 614, 622 (7th Cir.1986); *Atchley v. Qonaar Corp.,* 704 F.2d 355, 358 (7th Cir.1983); *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). *See also Serabian v. Amoskeag Bank Shares,* 24 F.3d 357 (1st Cir.1994) (noting that securities laws " 'do not guarantee sound business practices' " and that "plaintiffs must plead more than that defendants acted irresponsibly or unwisely") (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)); *Field v. Trump,* 850 F.2d 938, 948 (2d Cir.1988), *cert. denied,* 489

U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 638–40 (3d Cir.1989); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994); *Gaines v. Haughton,* 645 F.2d 761, 779 n. 33 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); *Kas v. Financial Gen. Bankshares, Inc.,* 796 F.2d 508, 513 (D.C.Cir. 1986). The precise parameters of the rule announced in *Santa Fe,* however, are far from clear. The difficulty arises because, as the Court recognized in *Santa Fe,* a breach of fiduciary duty may give rise to a Rule 10b–5 action where the breach involves deception or manipulation; and, "[t]he line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628 (3d Cir.1989). We therefore must begin our analysis with a brief review of pertinent decisions that have grappled with this difficult issue.

The Seventh Circuit's treatment of this issue is, perhaps, best illustrated by *Panter.* In *Panter,* the plaintiffs, shareholders of Marshall Field & Co. ("Field's"), sued the defendant directors alleging that the directors committed securities fraud when they successfully repelled a hostile takeover attempt, allegedly "motivated by a desire to perpetuate their own control over Field's [and pursuant to an undisclosed] policy of resisting all offers to acquire Field's, regardless of the potential benefits such offers might bring to the shareholders of the company." *Panter,* 646 F.2d at 288 (internal quotation marks omitted). Plaintiffs further alleged that pursuant to this undisclosed policy, "the defendants issued a 'stream' of deceptive or misleading statements, and engaged in conduct which acted as a deception." *Id.* at 289. The court quickly did away with plaintiffs' security fraud claim insofar as it was premised on the directors' failure to disclose their entrenchment policy. The court explained:

> In the wake of *Santa Fe,* courts have consistently held that since a shareholder cannot recover under 10b–5 for a breach of fiduciary duty, neither can he "bootstrap" such a claim into a federal securities action

by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.

.     .     .     .     .

The plaintiffs' allegations that Field's directors rebuffed all acquisition attempts without regard to merit and failed to disclose the existence of an alleged policy so to act, are ... insufficient to create a federal cause of action.... [T]hey simply state a claim for a breach of fiduciary duty directors owe shareholders under state corporate law. This is precisely the type of claim the Supreme Court intended to bar from the federal forum when it announced the rule in *Santa Fe Industries*. *Id.* at 288–89; *see also Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C.Cir. 1986) (stating that a "plaintiff may not bootstrap a claim of breach of fiduciary duty into a federal securities law claim by alleging that directors failed to disclose that breach of fiduciary duty"); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978) (concluding "[I]n effect, appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a violation of the Act. We refuse to adopt this approach, which would clearly circumvent the Supreme Court's holding in *Santa Fe*.").

In turning to consider the plaintiffs' claims that the directors had made deceptive or misleading statements pursuant to their entrenchment policy, the court noted that its analysis was guided by:

the post-*Santa Fe* rule that if the central thrust of a claim ... arises from acts of corporate mismanagement, the claims are not cognizable under federal law. To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship.

*Id.* at 289. We will not review the court's consideration of each allegedly misleading statement examined in *Panter*; however, we will briefly mention one of the court's more relevant statements. Particularly noteworthy is the court's treatment of the claim that the Board misrepresented the nature of the consideration it had given to the takeover proposal when it stated that it had rejected the offer only after "careful consideration." *Id.* at 290. The court found that no reasonable juror could find that the Board did not sufficiently consider the proposal in light of evidence that the Board met for several hours solely to consider the proposal. *Id.* However, the court went on to add:

Furthermore, even if the defendants did reject the proposal without the careful consideration the evidence unquestionably establishes they did, this decision would be insulated from federal securities law scrutiny by the rule of *Santa Fe*.

*Id.*

As we noted above, however, the mere fact that the conduct complained of involves a breach of fiduciary duty does not, alone, preclude a cognizable claim under the federal securities laws. *Santa Fe* plainly contemplated that a breach of fiduciary duty can give rise to a federal securities cause of action where "the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." 430 U.S. at 473–74, 97 S.Ct. at 1301. As explained by the Third Circuit, the "crucial difference" between a breach of fiduciary claim that can support a .federal securities claim and one that cannot "is whether there was misrepresentation or omission in the flow of material information." *Craftmatic Sec. Litig.*, 890 F.2d at 639.

Acknowledging that "[a]rguably, any action amounting to corporate mismanagement would be material, that is, substantially likely to assume significance in the decisionmaking of the reasonable investor," the Third Circuit observed that "courts have been reluctant to permit a federal securities claim to stand when the plaintiff has failed to allege more than nondisclosure of mismanagement. *Id.* Accordingly, the Third Circuit offered the following guidance:

The violation of federal law stems from the substantial likelihood that disclosure "would have been viewed by the reasonable investor as having significantly al-

tered the 'total mix' of information" available, not from a determination that an undisclosed act constitutes a breach of fiduciary duty or that a transaction was unfair to investors. Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.

*Id.* at 639–40. Unfortunately, in light of its prefatory remark that, "[a]rguably, any action amounting to corporate mismanagement would be material ...," the standard that the Third Circuit purports to offer provides virtually no guidance. And, in practice, the Third Circuit's treatment of the mismanagement allegations under consideration revealed no effort to evaluate whether the allegations of corporate mismanagement, inadequacy, and ineptitude could be considered material. The allegations contained in the *Craftmatic* plaintiffs' complaint included, *inter alia*, allegations that the company's prospectus, which represented that the company had embarked on an expansion program into new product markets, was materially misleading in that it failed to disclose:

● "that Craftmatic's internal product studies, investigations, examinations or plans provided little or no meaningful information concerning the question of whether Craftmatic could profitably expand....";

● "that Craftmatic was totally unfocused ... and ... was unable to manage the businesses in which it was already involved";

● "that the Company did not have adequate internal management controls ... to monitor effectively the costs generated by Craftmatic's rapid expansion"; and,

● "that Craftmatic's management information systems were wholly inadequate in providing timely and accurate information so as to permit management properly to forecast, control, and account for the Company's ... overall financial performance."

890 F.2d at 632–33 n. 5. The Third Circuit summarily affirmed the dismissal of the 10b–5 claims predicated on these allegations, simply stating that they did not implicate the concerns underlying the federal securities laws. *Id.* at 640. Implicit in the court's holding is the finding that the value of such disclosures depended solely on "whether there ha[d] been a breach of faith or ineptitude on the part of management." *Id.* Thus, the Third Circuit appears to be in accord with other circuits holding that the failure to disclose corporate mismanagement or ineptitude is not actionable under the federal securities laws.

This general rule is subject, however, to the following qualification: While neither an allegation of mismanagement on the part of a defendant nor an allegation that a defendant failed to disclose his or her mismanagement will alone support a Rule 10b–5 claim, "a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992); *see also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994) ("In stating an actionable claim for misrepresentation, ... plaintiffs must plead more than that defendants acted irresponsibly and unwisely, but that they were aware that 'mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.' ") (quoting *Hayes* ).

▮ Our review of the caselaw developed under *Santa Fe* leads us to the following conclusions regarding the appropriate standards to be applied in the instant case. First, mere allegations of a defendant's breach of fiduciary duty or that a defendant failed to disclose his or her breach of fiduciary duty cannot support a claim under Rule 10b–5. "Certainly this is true of allegations of garden-variety mismanagement, such as managers failing to maximize value for ... shareholders, of directors failing to adequately inform themselves, or of managers acting in a generally self-entrenching fashion." *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988) (internal quotation marks and citations omitted). Second, the fact that the challenged conduct may constitute a breach of fiduciary duty does not insulate the conduct

from a Rule 10b–5 claim; however, for the conduct to be actionable it must involve deception or manipulation. This requirement may be met either where (1) the fiduciary misconduct itself involves an element of deception, *see Santa Fe,* 430 U.S. at 475 n. 15, 97 S.Ct. at 1301–02 n. 15; *Panter,* 646 F.2d at 288 (noting that "the critical issue ... is whether the conduct complained of includes the omission or misrepresentation of a material fact, or whether it merely states a claim for breach of state law duty"), or (2) the defendant is aware of corporate mismanagement and makes a material public statement inconsistent with the state of corporate affairs, *see Hayes,* 982 F.2d at 106; *Serabian,* 24 F.3d at 361.

With these standards in mind, we now consider plaintiffs' allegation that UAL's failure to disclose that it had not completed its analysis of the best distribution method rendered the October 29, 1987 dividend announcement false and misleading. Plaintiffs argue that had this information been disclosed, a reasonable investor would have concluded that the chances of a dividend being declared were significantly decreased and the likelihood of a tender significantly increased. More completely, plaintiffs argue that the total mix of information was altered by defendant's failure to disclose that "the announcement was subject to the completion of defendant's study of the best method of distribution which had not been completed" in conjunction with the failure to disclose (1) that Coniston opposed a dividend and had done so for several months, (2) that the announcement was subject to further negotiation with Coniston, and (3) that "Coniston's dispute with defendant's position on this issue remained unresolved." However, as we have discussed above, we find that the record simply does not support plaintiffs' contention that Coniston had demanded a nondividend distribution prior to the October 29, 1987 announcement nor that negotiations were ongoing between Coniston and Allegis over this issue. Accordingly, we need not consider the materiality of UAL's alleged failure to disclose its lack of analysis in conjunction with these unsupported allegations.

The extent to which corporate directors must investigate the merits of a proposed corporate transaction is a matter committed to the sound discretion of the directors in the exercise of their directorial judgment; and, a failure to adequately inform themselves may give rise to a claim for breach of fiduciary duty. *See e.g., Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del.1985). It is not, however, actionable under the anti-fraud provisions of the federal securities laws. *See Field v. Trump,* 850 F.2d at 948 (noting that garden-variety corporate mismanagement such as directors failing to adequately inform themselves is not actionable); *see also Craftmatic Sec. Litig.,* 890 F.2d at 640 (dismissing 10b–5 claim predicated, *inter alia,* on allegation that company's internal product studies and investigations provided no useful information). Thus, to the extent that the central thrust of plaintiffs' claim is that the Board failed to adequately investigate the relative merits of a dividend versus self-tender distribution, their claim is plainly barred by *Santa Fe.* Nor may plaintiffs bootstrap this breach of fiduciary duty claim into a federal securities claim by alleging that the failure to disclose the fiduciary breach constitutes a material omission. *Panter,* 646 F.2d at 288.

The picture painted by plaintiffs in this case is that the UAL Board endorsed the dividend distribution plan either without adequate consideration or as a means of obtaining leverage over Coniston pursuant to a program of entrenchment. Plaintiffs cannot prevail under either theory. It should be clear from the foregoing discussion that plaintiffs cannot prevail under the former theory because the Board's failure to adequately consider the distribution method issue bears solely on their fiduciary duties. With respect to the latter, the Seventh Circuit's discussion of *Bucher v. Shumway,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97, 142, 1979 WL 1254 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 572 (2d Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980), cited with approval in *Panter,* is instructive:

[I]n *Bucher* ... the plaintiff shareholders charged that the defendants, directors of their company, had rejected a favorable

tender offer proposal without fairly considering it, an had instead sought to entrench themselves in control of the corporation by supporting a "friendly" tender offer at an unfair price. The court dismissed the shareholders' claims stating, "[T]he bare allegation does not state a cause of action under the securities laws.... It is essentially an allegation that [the directors] breached fiduciary duties owed to plaintiffs and then failed to disclose these alleged breaches."

*Panter*, 646 F.2d at 288. We believe that the same analysis applies to the instant case and compels the conclusion that plaintiffs do not state a claim under the federal securities laws for failing to disclose that defendant had not completed its analysis of the best distribution method.

## III. Plaintiffs' Invocation of The Duty to Update

■ Finally, we must consider one last yet critical issue: Whether, in response to UAL's motion for summary judgment, plaintiffs impermissibly seek to assert an eleventh-hour legal theory that has not heretofore been a part of this case—namely a duty to update [26] —which the Court should not permit; or, whether this legal theory has been a part of this case all along or may otherwise properly be raised in response to UAL's motion.

In response to UAL's motion for summary judgment, plaintiffs argue, among other things, that Allegis suppressed material facts that came into existence after the October 29, 1987 announcement and which gave rise to a duty to update the announcement. *See* Pls.'

Mem. at 31–35. Plaintiffs enumerate those facts as follows:

- Coniston continued to seek a tender and oppose a dividend;

- Defendant continued to be actively engaged in negotiations with Coniston over the tender issue;

- Defendant increased the pace of its studies and was actively studying the best method of distribution by comparing the after-tax consequences of a tender with a dividend and First Boston concluded that a tender was clearly much better for defendant's shareholders;

- Defendant prepared legal documents needed for a tender; and

- Defendant eliminated references to a dividend in legal documents used in connection with its bank loans.

*Id.* at 32.

UAL asserts that plaintiffs' claim that it had a duty under Rule 10b–5 to update the October 29 announcement "comes as a surprise," noting that the amended complaint nowhere alleges that plaintiffs "have been damaged by any failure on the part of UAL to 'correct' the October 29th announcement based on subsequent information.... Nor have plaintiffs *ever* raised this theory during the nearly five years of discovery in this case." Def.'s Reply at 31–32. UAL argues that plaintiffs' attempt to raise this new theory amounts to an attempt to amend the complaint and that such an attempt is untimely. From plaintiffs' view, the duty to

---

**26.** Recently, in *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331–33 (7th Cir.1995), the court distinguished between two approaches to proving a false or misleading statement or omission for purposes of a Rule 10b–5 claim: a "duty to correct" and a duty to "update." As explained by the Seventh Circuit:

The former applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company then must correct the prior statement within a reasonable time. *Id.* at 1331. The duty to update, on the other hand, applies to "forward-looking" statements— *e.g.*, projections and predictions—that because of subsequent events become untrue. The court noted that in such cases, "[s]ome have argued

that a duty to update arises," *id.* at 1332, however, the court declined to embrace such a theory. *Id.* Instead, the court found that "a projection can lead to liability only if it was not made in good faith or was made without a reasonable basis." *Id.* at 1333. (We shall return to the significance of *Stransky* momentarily.) In the instant case, plaintiffs assert that events coming into existence after the October announcement made it unlikely that the Board would, in fact, declare special dividends as it had previously announced. Because the October 29 announcement involved a forward-looking statement—an announcement of the Board's intention to declare special dividends after the divestiture transaction closings—we shall refer to plaintiffs' claim as a duty to update claim.

update claim has been a part of this case from the beginning.

In support of its contention that the duty to update claim has been "part of this case from its inception," plaintiffs direct this Court's attention to excerpts of Opinions previously issued in this case by Judge Nordberg, wherein Judge Nordberg appears to recognize that plaintiffs' claims embrace Allegis' failure to disclose its ongoing negotiations with Coniston both before and after October 29, 1987. For instance, plaintiffs look to Judge Nordberg's July 21, 1992 Memorandum Opinion and Order denying defendant's first motion for summary judgment where, in setting out the facts, he states:

> On October 29, 1987, UAL announced that the proceeds of its divestiture program would be distributed through a special dividend. The proposed special dividend was announced in a one-page press release. That the special dividend would be the mechanism for distribution was reiterated by UAL and reported by the financial press on several occasions between October 29 and December 8, 1987. The plaintiffs were aware of these representations.
>
> Plaintiffs contend, however, that beginning in the summer of 1987 and continuing throughout the spring of 1988, Coniston was negotiating with UAL to distribute the proceeds of the divestiture program through a buy-back of shares, rather than through a special dividend. While allegedly contemplating the buy-back program at Coniston's behest, UAL continued to publicly assert its intention to issue a special dividend, without mentioning its ongoing negotiations with Coniston. Moreover, the plaintiffs contend that throughout this period of public adherence to the special dividend form of distribution, UAL failed to disclose that it had not completed its evaluation of the relative merits of the two contemplated forms of distribution.

*Fry v. UAL Corp.*, No. 90 C 999, Mem.Op. & Order 2, 1992 WL 177086 (N.D.Ill. July 21, 1992). However, plaintiffs' reliance on this language is questionable. The July 21, 1992

Opinion required the court to rule on dispositive motions directed at *both* the original complaint and the amended complaint; thus, Judge Nordberg had both complaints before him and it is apparent that he drew on allegations from both in formulating this statement of background facts. Unfortunately, he did not attribute his summary of the allegations to a particular source. Nevertheless, it is clear that the foregoing passage draws, in large part, on allegations from the original complaint. Indeed, it is actually quite clear that this passage was based almost exclusively on the original complaint. The passage is drawn virtually verbatim from the court's Order granting class certification, which was issued before the amended complaint was even filed.[27] *See Fry v. UAL Corp.*, 136 F.R.D. 626, 629 (N.D.Ill.1991). Only the original complaint speaks of Allegis reiterating its representation regarding a dividend distribution during the period between October 29 and December 8, 1987; and, this allegation was deleted from the amended complaint. *Compare* Compl. ¶ 13 *and* Am.Compl. ¶ 20. Only the last sentence in the passage is drawn from plaintiffs' amended complaint and even that sentence incorporates allegations from the original complaint by referring to a "period of public adherence to the special dividend form of distribution."

Plaintiffs also direct this Court's attention to a later passage in the same opinion as follows:

> And Judge Nordberg again refutes defendant's [position that the duty to update claim is new to this litigation] when he concludes that: "plaintiffs ... alleg[e] 10b-5 violations arising out of UAL's *failure to disclose* that Coniston had been pressuring UAL ... [for] distribution ... through a self-tender, *even after ... [its] public [dividend] announcement ... on October 29, 1987.*"

Pls.' Surreply at 5. However, what plaintiffs failed to include, by accident or design, is the Court's prefatory clause revealing that the Court was discussing the allegations of the original complaint *not* the amended com-

---

**27.** The amended complaint was filed on November 12, 1991. Judge Nordberg's Memorandum

Opinion and Order granting class certification was issued May 1, 1991.

**1048**

plaint.* The passage actually begins, "[T]he plaintiffs filed their *initial complaint* on February 21, 1990, alleging 10b–5 violations...." Thus, although plaintiffs' representation that this passage reflects Judge Nordberg's understanding "that defendant's failure to report the ongoing Coniston negotiations both before and after the October 29 announcement was an integral aspect of plaintiffs' Rule 10b–5 claim" is literally accurate, it is quite misleading in the present context given that the plaintiffs subsequently filed an amended complaint in which they omitted, among other things, their reference to defendant's failure to correct its earlier misrepresentation.

The filing of an amended complaint has the effect of superseding the original complaint. *See Nisbet v. Van Tuyl,* 224 F.2d 66, 71 (7th Cir.1955) ("An amended pleading ordinarily supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not stated in the amended pleading."). Thus, to the extent that plaintiffs rely on the Court's, the defendant's, or their own characterizations of the subject matter of this lawsuit prior to the filing of the amended complaint to support their contention that a duty to update claim has been part of this case all along, their efforts are misdirected.

The proper inquiry in determining whether the duty to update claim is properly before the Court must be whether the factual allegations of the amended complaint sufficiently support that claim. And, our consideration of those allegations must be guided by the requirement of Federal Rule of Civil Procedure 9(b) that allegations of fraud "shall be stated with particularity." "It is well established that Rule 9(b) [of the Federal Rules of Civil Procedure] governs claims based on fraud and made pursuant to the federal securities laws." *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990) (internal quotation marks and citation omitted); *see also Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992) (affirming dismissal of securities fraud allegations where the allegedly nondisclosed material facts were not alleged with sufficient particularity); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.) (noting, in securities fraud case, that Rule 9(b) "requires the plaintiff to state 'with

particularity' any 'circumstances constituting fraud'" and that "the 'circumstances' must be pleaded in detail"), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). With Rule 9(b)'s requirements in mind we now consider the allegations of the amended complaint.

Conveniently, the amended complaint begins with a paragraph under the heading "NATURE OF THE CASE" which is instructive in evaluating the factual bases upon which the complaint rests. That paragraph states, in pertinent part:

> *On October 29, 1987* defendant publicly announced that it would distribute the proceeds of the sale of its non-core businesses as a special shareholder dividend. *This announcement* was materially false and misleading because *it* failed to disclose (a) the ongoing negotiations and demands of defendant's principal shareholder for a buyback instead of a dividend and (b) the fact that defendant had not *then* completed a comparison of the after tax consequences to its shareholders of the two principal methods for distributing the proceeds of a divestiture.... The facts which defendant suppressed *when it made its dividend announcement* ultimately led to a repurchase of shares rather than a special dividend.

Am.Compl. ¶ 1 (emphasis added). By way of comparison, we note that when plaintiffs intended to bring material misstatements or omissions occurring after the October 29th announcement, and throughout the duration of the class period, within the scope of their complaint, they knew how to do so explicitly. The counterpart of this paragraph in the original complaint states, in pertinent part:

> *During the Class Period,* defendant publicly stated that it would distribute the proceeds of the sale of its non-core businesses as a special shareholder dividend. *These statements* were materially false and misleading because *they* failed to disclose the ongoing negotiations and demands of defendant's principal shareholder which led to a repurchase of shares rather than a special dividend. *These statements* operated to artificially depress the market price of defendant's common stock and puts during the Class Period.

Compl. ¶ 1 (emphasis added). Plaintiffs' statement of the case in the amended com-

plaint plainly suggests that the gravamen of the complaint is that the announcement was misleading when made, and provides no indication that the claim is predicated on a failure to update the misleading announcement based on facts arising after the date of the announcement.

This conclusion is further supported by the following comparisons between the original and amended complaints. The original complaint included the following allegations under count I:

### COUNT I

### VIOLATION OF SECTIONS 10(b) AND RULE 10B–5 OF THE EXCHANGE ACT

.  .  .  .  .

35. As a result of defendant's October 29, 1987 announcement that it would issue a special dividend and the reiteration of that position during the Class Period, combined with defendant's failure to disclose that it was negotiating with Coniston, and that Coniston was seeking a buy back instead of a special dividend, plaintiffs reasonably believed that defendant was not negotiating over a buy back with Coniston.

36. At no time during the Class Period did defendant attempt to correct the untrue statements created by its failure to disclose the negotiations regarding a buy back with Coniston, a shareholder which had enormous ability to determine the course of defendant's conduct. To the contrary, defendant affirmatively suppressed disclosure of its conversations with Coniston.

Compl. ¶¶ 35, 36. In the amended complaint, paragraph 36 is completely omitted, and paragraph 35's allegations are effectively replaced as follows:

### COUNT I

### FAILURE TO DISCLOSE NEGOTIATIONS OVER CONISTON'S DEMANDS FOR A BUYBACK AT THE TIME OF DIVIDEND ANNOUNCEMENT

### VIOLATION OF SECTIONS 10(b) AND RULE 10(b)–5 OF THE EXCHANGE ACT

.  .  .  .  .

43. As a result of defendant's October 29, 1987 announcement that it would issue a special dividend combined with defendant's failure to disclose that it was negotiating with Coniston, and that Coniston was seeking a buyback instead of a special dividend, plaintiffs reasonably believed that defendant was not negotiating over a buyback with Coniston.

Am.Compl. ¶ 43. The omission of the allegation concerning defendant's failure to attempt to correct and the explicit inclusion of the heading "FAILURE TO DISCLOSE NEGOTIATIONS OVER CONISTON'S DEMANDS FOR A BUYBACK AT THE TIME OF DIVIDEND ANNOUNCEMENT" certainly has the effect of suggesting that plaintiffs were abandoning whatever failure to update claim they might have been asserting previously. It is incomprehensible that, if plaintiffs intended to assert a failure to update claim, they would omit the one allegation explicitly speaking to such a claim. Moreover, the simultaneous addition of a heading that explicitly refers to the "time of dividend announcement" bolsters this conclusion.

On the affirmative side, plaintiffs fail to direct the Court to any specific allegations stating with particularity the circumstances giving rise to Allegis' duty to update. By way of supporting their position with references to allegations of the amended complaint, plaintiffs offer only the following:

[P]laintiffs complain that "starting in August of 1987 and *continuing through the Spring of 1988, defendant secretly negotiated with Coniston* over Coniston's demand that the proceeds of these sales ... be distributed as a [tender] ... rather than a special dividend." F.A.C. ¶ 18 (emphasis added). And this factual assertion is incorporated by reference in Count I and forms a part of the basis of plaintiffs' allegation that: *"[t]hroughout the class period,* ... defendant knowingly and/or recklessly ... *omitted to state material facts necessary in order to make [its] statements not misleading." Id.* at ¶ 42 (emphasis added).

Pls.' Surreply at 3–4. We are unable to conclude that this vague reference to secret negotiations continuing throughout the spring of 1988, even in conjunction with the boilerplate allegation noted by the plaintiffs, pleads the circumstances underlying plaintiffs' duty to update claim with sufficient particularity to encompass that claim within the complaint. And, with respect to the other post-announcement facts identified by plaintiffs in their memorandum opposing summary judgment, we note that there is simply no mention of these in the amended complaint.[28] Thus, for all of the foregoing reasons, we conclude that plaintiffs did not sufficiently plead with particularity facts supporting a duty to update claim and therefore such a claim is not properly before the court.

■ We must consider, then, whether an amendment to the complaint at this point is untimely.[29] Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint "shall be freely given when justice so requires." In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court instructed:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to correct deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182, 83 S.Ct. at 230. "Generally, 'the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court.'" *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773 (7th Cir.1995) (quoting

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971)). As we explain below, the history of this case compels the conclusion that plaintiffs have unduly delayed in seeking to amend their complaint to properly allege a duty to update claim.

■ By way of background, this case was originally filed on February 21, 1990—approximately 5½ years ago. The amended complaint in this case was filed on November 12, 1991. After numerous extensions, non-expert discovery was ordered closed on February 2, 1994. *See* Minute Order dated 1/19/94. Regardless of the closing date for discovery, it is significant to note that the overwhelming majority of discovery had been obtained well in advance of that date. Davis Polk attorneys Kerr and Kess were deposed on November 17, 1992. Those depositions further reveal that Davis Polk time sheets had already been produced to the plaintiffs prior to the depositions. First Boston's Pinson was deposed on September 24, 1992 and again on April 14, 1993. Calhoun was deposed on July 16, 1991 and again on April 14, 1993. Allegis Chairman Frank Olson was deposed on July 21, 1992 and General Counsel Hoenicke was deposed on March 17, 1993. The Coniston principals were deposed on December of 1992 (Gollust), February 2, 1993 (Oliver), and November 3, 1993 (Tierney). Although various documents may have trickled in after these depositions, it is apparent to the Court from reviewing all of the evidence that has been submitted in this case that all of the evidence supporting plaintiffs' duty to update claim was in their hands many many months if not years before the close of discovery in February 1994.[30]

---

**28.** For reasons that escape this Court, plaintiffs have made no effort to argue that the facts alleged in paragraphs 31(a)–(d) of its complaint require the denial of summary judgment or support a failure to correct claim. Accordingly, we express no opinion as to whether those paragraphs—which are placed under the heading "COMPLIANCE WITH THE NEW 10(b)–5 STATUTE OF LIMITATIONS" and which allege various acts of concealment following the October 29th announcement—would have been availing. As the Seventh Circuit recently noted in *Stransky*, "The federal courts will not invent legal arguments for litigants." 51 F.3d at 1325.

**29.** There is, of course, no motion to amend the complaint before the Court. However, defendants have placed the issue squarely on the table and plaintiffs had the opportunity to respond to defendant's arguments. Therefore, the Court shall address the merits of a motion to amend the complaint.

**30.** UAL notes that on September 3, 1991, the following items were produced to plaintiffs: Davis Polk time sheets; a memorandum dated 11/23/87 from Pinson to Calhoun discussing the self-tender and dividend alternatives; a 12/6/87 draft tax section for the Offer to Purchase. Def.'s Reply at 33 n. 24. As UAL correctly notes,

Furthermore, two deadlines for filing amendments to the pleadings have come and passed in this case. The record reveals that on both of these occasions plaintiffs consciously chose not to amend their complaint. Defendants have submitted a letter dated December 9, 1992 from plaintiffs' counsel to defendant's counsel which states, in pertinent part:

> I did not agree to extend the time to amend the pleadings. Only the Court can do that. We looked closely at our Complaint in connection with the Court's deadline and we assume your firm looked closely at its pleadings as well. As far as we are concerned, the time for amendments is over.

Def.'s Reply Add'l Facts, Ex. 22. Also, at a status hearing in this case held on August 23, 1994, plaintiffs' counsel informed the Court that he was considering filing a motion for leave to file a second amended complaint in anticipation of defendant's impending motion for summary judgment. Counsel stated that the purpose of the second amended complaint was to respond to issues raised in defendant's anticipated motion.[31] Thereafter, the parties submitted an "agreed motion" to set a briefing schedule on defendant's motion for summary judgment. That motion states:

> [P]laintiffs have reconsidered their position on amending their complaint prior to defendant's motion for summary judgment. Plaintiffs now believe that moving to amend the complaint will unnecessarily delay consideration of defendant's motion. Plaintiffs therefore do not intend to amend their complaint at this time and, although they may move to amend the complaint at some time in the future, plaintiffs no longer believe that it is prudent to delay summary judgment proceedings in order to consider a proposed amendment to the complaint.

Agreed Motion to Establish a Briefing Schedule (Aug. 31, 1994) ¶ 2.

In view of all of the foregoing facts, it is quite apparent that plaintiffs have had ample opportunity—which they have foregone—to amend their complaint. In their surreply to the instant motion for summary judgment, plaintiffs assert, "While there is no need to amend here, should the court decide otherwise, plaintiffs should be given an opportunity to do so before resolution of the pending motion." In view of plaintiffs' decision not to seek leave to amend *prior* to the filing of defendant's summary judgment motion, their request to be given an opportunity to amend now—after the Court has worked its way through three oversized briefs, a surreply, and hundreds of pages of accompanying exhibits—is most surely untimely. Accordingly, the Court finds that plaintiffs have unduly delayed in seeking to amend their complaint to plead facts that would support a duty to update claim. *See Cleveland v. Porca Co.*, 38 F.3d 289, 297 (7th Cir.1994) (finding no abuse of discretion in denying motion to amend complaint where motion was filed after discovery was completed, motions for summary judgment were fully briefed, and witness and exhibit lists were already submitted); *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir.1987) (finding no abuse of discretion in denying motion to amend complaint where motion was filed after discovery was completed and after defendant had moved for summary judgment, without adequate explanation for the delay, in "an apparent attempt to avoid the effect of summary judgment"); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir.1982) (finding no abuse of discretion in denying motion to amend complaint where motion was filed after discovery was completed and sought to inject a new theory of recovery into the litigation).

these exhibits play central roles in underpinning plaintiffs' duty to correct claim. And, it is worth noting that they were in plaintiffs' possession even before they filed their first amended complaint.

31. Pursuant to this Court's standing order regarding pretrial procedures in civil cases, prior to filing a motion for summary judgment, the moving party must first serve the nonmoving party with a concise letter summarizing the legal and factual grounds for the motion, with references to supporting authorities, and make a sincere effort to resolve issues relating to the motion.

The Court also finds that an amendment to the complaint asserting a new theory of recovery would be prejudicial to UAL. If plaintiffs are allowed to amend their complaint at this late hour, UAL would be forced to duplicate its previous discovery efforts in order to properly prepare a defense to the newly asserted charges. *See Murphy,* 691 F.2d at 353.[32] There is no just reason to force a defendant to defend against claims one at a time when the plaintiff is fully aware of the facts giving rise to its amended counts well in advance of the date set for the filing of dispositive motions. In the absence of any explanation by plaintiffs for their delay in seeking to amend their amended complaint, the Court finds that any motion to amend at this late date must be denied.[33]

Finally, we believe that plaintiffs' efforts in amending the complaint to assert a duty to update claim would ultimately be futile. As noted above, the Seventh Circuit recently refused to adopt the position that forward-looking statements give rise to a duty to update when subsequent events make them no longer true. The court held that forward-looking statements—such as projections or predictions—are actionable only if they were made without a reasonable basis or were not made in good faith. *Stransky,* 51 F.3d at 1333. The court noted, however, that its analysis was limited to forward-looking statements such as predictions or projections and that it "express[ed] no opinion on whether the outcome would be the same if a plaintiff contested statements of intent to take a certain action." *Id.* at 1332 n. 4. Thus, this case, dealing as it does with defendant's announcement of its intention to distribute the divestiture proceeds by way of special dividends, is not directly controlled by *Stransky.*

We find, however, that the reasoning underlying the court's refusal to embrace a duty to update with respect to projections and predictions applies equally to statements of intent.

In rejecting the duty to update projections and predictions, the *Stransky* court noted that the language of Rule 10b–5 makes it unlawful:

> To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, *in light of the circumstances under which they were made,* not misleading.

*Stransky,* 51 F.3d at 1332 (quoting 17 C.F.R. § 240.10b–5) (emphasis added). Based on this language, the court reasoned:

> The rule implicitly precludes basing liability on circumstances that arise after the speaker makes the statement. In addition, the securities laws typically do not act as a Monday Morning Quarterback. "The securities laws approach matters from an *ex ante* perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true." *Pommer v. Medtest Corp.,* 961 F.2d 620, 623 (7th Cir.1992). These considerations give us serious pause in imposing a duty to update.

*Id.* These remarks are no less true with respect to a Board's announcement of its intentions to take a certain action. As the Third Circuit has recognized, "[c]hanged circumstances naturally can require a change in plans." *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1245 (3d Cir.1989). This case dramatically illustrates that principle. After

---

**32.** Plaintiffs' assertion that UAL would not be prejudiced because extensive discovery has already been taken concerning post-October 29, 1987 events has very little force. Any experienced litigator is well aware that a deposition cannot be adequately conducted or defended without a solid understanding of the theory of the case.

**33.** It must also be noted that district courts must retain broad discretion to avoid consciously planned piecemeal litigation in order to manage their dockets. Plaintiffs' eleventh hour efforts to amend their complaint, particularly in light of

the fact that this Court granted them the opportunity to file a motion for leave to amend *before* defendant filed its dispositive motion, works a substantial burden on the Court's ability to manage its docket. It is simply unreasonable for a plaintiff to ask the Court to manage his or her case in a piecemeal fashion one claim at a time as the plaintiff sees fit to bring them. Litigation is not a card game where a party reveals one card or claim at a time. Such piecemeal litigation is not only prejudicial to the defendant but also precludes the Court from adjudicating the case in a timely and efficient manner.

making its announcement, the Board was confronted with the implications of the October 19, 1987 stock market crash with respect to its decision to employ a special dividend. Once those implications were clear, the Board, in the exercise of its judgment, altered its course and promptly disclosed this fact to the public. We can find no basis to impose Rule 10b–5 liability on the defendants under such facts. We agree with the Third Circuit in concluding that "a statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b–5." *Id.*

 We further conclude that the rule announced in *Stransky* should govern the instant case. That is, that a statement of intent—like a projection or prediction—will result in liability only if the plaintiff can establish that it was not made in good faith or upon a reasonable basis. Our resolution of UAL's motion for summary judgment with respect to counts I and II compels the conclusion that plaintiffs could not prevail under such a standard. Therefore, we believe that an amended complaint would be futile.

## IV. Plaintiffs' State Law Claims

Plaintiffs assert four state-law claims. Plaintiffs assert a claim for common law fraud (count III) and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, (count V) based on Allegis' failure to disclose Coniston's demand and the ongoing negotiations over that demand. Similarly, plaintiffs assert a claim for common law fraud (count IV) and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, (count VI) based on Allegis' failure to disclose that it had not completed its analysis of the best method of distribution at the time of making the October 29, 1987 dividend announcement.

Having determined that UAL is entitled to summary judgment on both of plaintiffs' federal claims, thus disposing of the federal bases of jurisdiction in this case, the Court

shall decline to exercise its supplemental jurisdiction over these remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").[34]

### CONCLUSION

Defendant's motion for summary judgment [Docket # 206–1] is granted. This action is dismissed with prejudice. Defendant's objections to the Magistrate Judge's Order [Docket # 190–1] are denied as moot.

---

**34.** That portion of defendant's motion for summary judgment requesting that this Court dismiss the supplemental claims went unopposed by plaintiffs in both their memorandum in opposition to summary judgment as well as their surreply.